SEYFARTH SHAW LLP
Ryan McCoy (SBN 276026)
rmccoy@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:   (415) 397-8549

SEYFARTH SHAW LLP
Reiko Furuta (SBN 169206)
rfuruta@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:   (310) 201-5219

Attorneys for Defendant MAXIMUS
CONSULTING SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUDREA BARNES,<br><br>                     Plaintiff,<br><br>        v.<br><br>MAXIMUS CONSULTING<br>SERVICES, INC.; and DOES 1 through<br>30; inclusive,<br><br>                     Defendants. | Case No. 5:25-cv-02108-KK-SP<br><br>**DEFENDANT MAXIMUS CONSULTING SERVICES, INC.'S APPENDIX OF EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[Riverside County Superior Court Case No. CVPS2504251]<br><br>Date:    July 2, 2026<br>Time:    9:30 a.m.<br>Ctrm.:   3<br><br>Complaint Filed:  July 2, 2025<br>FAC Filed:  December 3, 2025<br>Trial Date:  None Set |

DEFENDANT'S APPENDIX OF EVIDENCE IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

326329061v.1

Defendant Maximus Consulting Services, Inc. ("Defendant" or "Maximus") hereby submits the following Evidence in support of Maximus's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment:

| No. | Description |
|---|---|
| 1. | **Declaration of Ryan McCoy** |
| 2. | McCoy Dec., Exhibit A: Excerpts from April 28, 2026 Deposition of Plaintiff Audrea Barnes |
| 3. | McCoy Dec., Exhibit 12: Plaintiff's email to Paula Hamilton dated December 26, 2022. |
| 4. | McCoy Dec., Exhibit 13: Paula Hamilton's email to Plaintiff dated January 26, 2023 |
| 5. | **Declaration of Ruby Williams** |
| 6. | Williams Dec., Exhibit A: Employee Handbook |
| 7. | Williams Dec., Exhibit B: December 2022 case investigation |
| 8. | Williams Dec., Exhibit C: May 11, 2023 email approving the medical leave of absence |
| 9. | Williams Dec., Exhibit D: Plaintiff's Worker History |
| 10 | Williams Dec., Exhibit E: January 9, 2024 letter from Nicole Heeder |
| 11. | **Declaration of Rebecca Kenawell** |
| 12. | Kenawell Dec., Exhibit 1: Plaintiff April 2023 Performance Review |
| 13. | Kenawell Dec., Exhibit 2: Spreadsheet with RIF list |

DATED:  June 4, 2026          SEYFARTH SHAW LLP

By:  _/s/ Ryan McCoy_
　　　　Ryan McCoy
　　　　Reiko Furuta
　　Attorneys for Defendant
　　MAXIMUS CONSULTING SERVICES, INC.

1

DEFENDANT'S APPENDIX OF EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

326329061v.1

# TAB 1

SEYFARTH SHAW LLP
Ryan McCoy (SBN 276026)
rmccoy@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:   (415) 397-8549

SEYFARTH SHAW LLP
Reiko Furuta (SBN 169206)
rfuruta@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:   (310) 201-5219

Attorneys for Defendant MAXIMUS
CONSULTING SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUDREA BARNES,<br><br>Plaintiff,<br><br>v.<br><br>MAXIMUS CONSULTING SERVICES, INC.; and DOES 1 through 30; inclusive,<br><br>Defendants. | Case No. 5:25-cv-02108-KK-SP<br><br>**DECLARATION OF RYAN MCCOY IN SUPPORT OF DEFENDANT MAXIMUS CONSULTING SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[Riverside County Superior Court Case No. CVPS2504251]<br><br>Date:   July 2, 2026<br>Time:   9:30 a.m.<br>Ctrm.:   3<br><br>Complaint Filed:  July 2, 2025<br>FAC Filed:  December 3, 2025<br>Trial Date:  None Set |

DECLARATION OF RYAN MCCOY ISO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

326328775v.1

## DECLARATION OF RYAN MCCOY

I, Ryan McCoy, declare as follows:

1.     I have personal knowledge of the facts contained in this declaration, and if called as  witness, I could and would testify as to their accuracy.

2.     I am an attorney licensed to practice law in the State of California, and I am admitted to appear before this Court. I am an attorney with the law firm of Seyfarth Shaw LLP in San Francisco, California, and I am one of the attorneys with primary responsibility for representing Defendant Maximus Consulting Services, Inc. ("Maximus") in the above-captioned matter, filed by Plaintiff Audrea Barnes ("Plaintiff"). All of the pleadings, discovery, and correspondence in this lawsuit are maintained in our office in the ordinary course of business under my direction and control. I have reviewed the pleadings, discovery and correspondence in preparing this declaration.

3.     On April 28, 2026, I deposed Plaintiff. Attached as **Exhibit A** is a copy of relevant excerpts from the transcript of the Deposition of Plaintiff taken on April 28, 2026.

        a.     Attached as **Exhibit 12** is a copy of Plaintiff's email to Paula Hamilton dated December 26, 2022., authenticated at Pl. Dep., 127:4-8.

        b.     Attached as **Exhibit 13** is a copy of Paula Hamilton's email to Plaintiff dated January 26, 2023, authenticated at Pl.'s Depo. 128:8-16.

4.     On May 14, 2026, I met and conferred with Plaintiff's counsel, Ed Antonino, via telephone pursuant to Local Rule 7-3. We discussed the bases for Maximus's motion for summary judgment, the relevant legal standards, and Maximus's evidence in support of the motion, including Plaintiff's recent deposition testimony. Plaintiff's counsel declined to dismiss any of the claims and we did not reach a resolution on any of the claims.

1

DECLARATION OF RYAN MCCOY ISO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

326328775v.1

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 4, 2026 at San Francisco, California.

_____
Ryan McCoy

2

326328775v.1

TAB 2

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---------------------------------X

AUDREA BARNES,                    :

                                :

          Plaintiff,             :

               v.                 : 5:25-CV-02108-KK-SP

MAXIMUS CONSULTING SERVICES,      :

And DOES 1 THROUGH 30 INCLUSIVE:

               Defendants.       :

---------------------------------X


Videotaped Deposition of AUDREA BARNES

La Quinta, California

April 28, 2026

9:30 a.m. PST


Job No.: 625425

Pages 1 - 142

Transcribed by: Jacalyn Mann

Transcript of Audrea Barnes
Conducted on April 28, 2026                    16

A    Not at this time.

Q    At some point, did a physician take you off work, or the ability to work, in the recent past?

A    Could you rephrase that question, please?

Q    Sure.  So when was the last time, to your knowledge, that you were able to work in any capacity?

A    When I was at Maximus.

Q    Okay.  And when did your -- strike that. Your employment with Maximus ended in August of 2023; is that correct?

A    Yes.

**Q    And since August of 2023, have you been physically able to work in any capacity?**

**A    No.**

Q    Have you sought a note from a physician permitting you to work with reasonable accommodation since your employment with Maximus ended in August of 2023?

A    No.

**Q    Have you applied for any jobs since your employment with Maximus ended in August of 2023?**

**A    No.**

Transcript of Audrea Barnes
Conducted on April 28, 2026                          20

am entitled to your best estimate, if you can

recall.  So if you can recall, other than the

names of the pharmaceuticals, because I'm the

same.  I will not remember either.  But can you

just generally describe the conditions or the

symptoms that those prescriptions have been --

A     Sure.

Q     -- prescribed to you?

A     I took a drug for stomach problems, for

thyroid problems, and high blood pressure.

Q     Are you taking any medications currently

for emotional distress?  Anxiety?

A     No.

**Q     Since your employment with Maximus ended**

**in August of 2023, have you taken any such**

**medications?**

**A     For anxiety, I don't recall.**

**Q     And not just anxiety, but emotional**

**distress, worry, depression?**

**A     I don't recall any.**

Q     Did you take any such prescription

medications or otherwise during your employment

with Maximus?

A     I don't recall.

Q     Other than talking to your attorney,

10:44:08
10:44:12
10:44:16
10:44:21
10:44:27
10:44:31
10:44:37
10:44:38
10:44:42
10:44:50
10:44:59
10:45:02
10:45:07
10:45:09
10:45:13
10:45:18
10:45:21
10:45:23
10:45:27
10:45:31
10:45:33
10:45:38
10:45:42
10:45:44
10:45:48

Transcript of Audrea Barnes
Conducted on April 28, 2026                    25

whether or not Maximus responded to any request
from your attorney seeking your records from
Maximus?

    A   I don't know what Maximus did.

    Q   In this complaint, it refers to Dion
Allen.  **What was Mr. Allen's relation to you at Maximus?**

    **A   He was my immediate supervisor at Maximus.**

    Q   And to your knowledge, what race was
Mr. Allen.

    A   I really don't know, because I worked
remotely.  I never seen him personally [sic].

    Q   You never saw him on a videoconference?

    A   No.

    Q   Did you have any inclination as to what
race Mr. Allen is?

    A   Yes.

    Q   And what is that?

    A   I assume he was black.

    Q   Did you watch a YouTube video of
Mr. Allen speaking at a church service?

    A   Yes, I did.  I just remembered, yes.

    Q   Okay.  And now that we've refreshed your
recollection --

10:53:49
10:53:53
10:53:58
10:54:02
10:54:09
10:54:17
10:54:25
10:54:27
10:54:32
10:54:36
10:54:40
10:54:43
10:54:47
10:54:53
10:54:56
10:55:03
10:55:06
10:55:11
10:55:12
10:55:14
10:55:18
10:55:21
10:55:27
10:55:31
10:55:35

not.  But he called me on the Teams, because we work remotely.  When the meeting was over, he called me back and told me what I -- I couldn't say those words.

Q    So, to your knowledge, you weren't given a written warning that was put in your personnel file; is that right?

A    It wasn't given to me.  I don't know what he did, but he did not present me with a written warning.

Q    Other than the Teams communication that you referred to, did Mr. Allen say anything else to you about not saying those phrases at the workplace?

A    There may have been some communication, but I just don't recall.

Q    And those Teams communications between you and Allen, Mr. Allen, that was just one on one; it wasn't a group chat, right?

A    No.  At the end of that staff meeting, he called me back on a one on one.

Q    So no one else was present for that communication?

A    No.

Q    To your knowledge, did Mr. Allen call

wanted to do surgery.

Q    What surgery was performed?

A    Exploratory surgery.

Q    Did the doctor give you any cause for why you had developed this condition?

A    I don't recall her saying so, what the root cause was.  I don't recall.  It may be in my medical records, but I don't recall having that conversation.

Q    What kind of doctor is Dr. Mehta?

A    Gastroenterologist.

Q    So you didn't see Dr. Mehta for treatment of mental or emotional issues; is that right?

A    No.  I had problems with keeping my food down.

Q    And have you -- other than Dr. Mehta, have you visited any other physician since August of 2023?

A    Yes.

Q    Have any of those physicians -- did you see them in order to address any emotional issues?

A    I don't recall.

**Q    Have you sought therapy or counseling since August of 2023?**

Transcript of Audrea Barnes
Conducted on April 28, 2026                    40

**A    I don't recall receiving any therapy or counseling, no.**

Q    Did you seek any therapy or counseling during your employment with Maximus?

A    I see a lot of doctors.  I'm trying to remember.

Q    And if you don't remember, that's fine.

A    I have over 12 doctors so it's -- then I had to change doctors because of my insurance.  So I don't recall at this time.  I have a lot of doctors.

**Q    You said 12 or so doctors.  Are any of them treating any emotional or mental issues?**

**A    No.  No.**

Q    So they were all relating to physical issues?

A    The ones I have now, yeah.  I had to switch doctors.

Q    And what insurance do you have right now that, for example, paid for the surgeries and the visits to Dr. Mehta?

A    Medicaid.

Q    Does Medicaid provide for --

A    Or Medicare.  It's the government insurance.

11:33:26
11:33:30
11:33:32
11:33:35
11:33:44
11:33:48
11:33:52
11:34:02
11:34:07
11:34:13
11:34:17
11:34:19
11:34:23
11:34:28
11:34:29
11:34:32
11:34:34
11:34:37
11:34:40
11:34:44
11:34:48
11:34:52
11:34:54
11:34:58
11:35:03

Transcript of Audrea Barnes
Conducted on April 28, 2026                        42

is identified is -- so just like you, I'm not good with medications, but I want to give this a go. Omeprazole?  What is that?

A    I think it's the one that Dr. Mehta prescribed.  I think that's the one.

Q    And what symptoms is that medication addressing?

A    The stomach.  Nervousness, things not staying down, you know.

Q    Okay.  To your knowledge, what do you attribute the nervousness to?

A    It's just not having a job.  That can be stressful.

**Q    And you're not physically able to work right now; correct?**

**A    Not at this time.**

Q    Under Special Interrogatory Number 8, it says, quote, State the name and address of each potential employer whom you contacted for the purpose of inquiring about or obtaining employment, other than defendant at any time after January 1, 2022.  In response you say, None; is that correct?

A    After, that is correct.

Q    And your employment with Maximus started

Interrogatory Number 9.  It asks you to, quote,
Identify all jobs to which you have applied since
August 1st, 2023.  And it says, None.  Is that
response correct?

**A     I haven't applied for any job after my**
**injury at Maximus.**

Q    Do you believe you were injured at
Maximus?

A    I work remotely.  So when you say at,
that's at their location?

Q    Well, you just said you were injured at
Maximus, I believe.  So I'm wondering what the
injury was.

A    I was injured during my employment
period, but not at the location.  Because I worked
out of my home.

Q    Did you apply for Workers' Compensation
benefits?

A    No.

Q    What was the injury that you sustained
that you're referring to?

A    It was hip and knee injury.

Q    Do you know the cause of those two
injuries?

A    Yes.

Transcript of Audrea Barnes
Conducted on April 28, 2026                                47

A    Yes, sir.

Q    Do you have any reason to believe that those responses are in any way inaccurate?

A    No, sir.

(Exhibit 7 was marked for identification and attached to the transcript.)

Q    These are Plaintiff's initial disclosures.  Have you seen this document before, Ms. Barnes?

A    I don't recall.  I'm sorry.

Q    I want to focus in on Page 5 under compilation of each category of damages.

A    Okay.

Q    Under B it says, quote, Loss of future income, approximately $100,000, depending on how long plaintiff remains unable to find comparable employment.  Do you see that?

A    Yes, sir.

**Q    To date, since your employment with Maximus ended in August of 2023, you have not made any attempt to find any comparable employment; is that right?**

**A    That's correct.**

**Q    Has any physician indicated to you a period of time when you might be able to begin**

Transcript of Audrea Barnes
Conducted on April 28, 2026                                    48

**applying for other jobs?**

        **A    No, sir.**

        Q    So you're -- it's indefinite, in terms
of when you may or may not ever be able to apply
for another job; is that correct?

        A    I can't attest to that.

        Q    Have you made any attempt to look for
any jobs since August of 2023, not withstanding
your medical conditions?

        A    No.

        Q    Have you looked at job boards to see
even what's out there?

        A    Yes.  I always get communications from
different job boards in my inbox.

        Q    Do you review those e-mails?

        A    Some of them.

        Q    Why only some -- some of them?

        A    Because they're voluminous.  Indeed,
from my alma mater, UCLA, they send me stuff from
the -- what do they call it -- my alumni
association, jobs and things.  So I get a lot of
-- I get about 30 to 40 e-mails a day.  So some of
them I look at, and some of them I don't.

        Q    So these responses were October of 2025.
But sitting here today in April of 2026, you

Q    I'm looking at your entire complaint.  I don't think there's a specific allegation in here that you were misclassified.  My understanding is that you are alleging incomplete wages due to your time as a nonexempt hourly employee, but there's no allegation as to misclassification.

MR. MCCOY:  And, Mr. Antonino, if you want to step in and clarify whether or not that's an actual cause of action, that would be helpful.

MR. ANTONIO:  Ms. Barnes, we do not have -- **I think you're getting confused.  We do not have a claim that you were misclassified.  We're just claiming that you are owed for labor law violations, as, like he said, a nonexempt employee's.**

**THE WITNESS:  Okay.  I misunderstood you.**

**Q    Okay.**

**A    Okay.  Now I understand.  Yes.** I was hired as a exempt employee, but my salary didn't -- my salary -- this is my understanding from my previous attorney.

Q    Wait.  Hold on.  Let me stop you.  I'm sorry.  I don't -- I know that they might not be your attorney anymore, but I don't want to know

Transcript of Audrea Barnes
Conducted on April 28, 2026                    55

about your specific communications with your prior                12:01:34

attorney, because you still have a privilege with                 12:01:37

them.  So if we have the clarification that you                   12:01:41

are not alleging misclassification for the period                 12:01:46

of time that you were salaried, then we can move                  12:01:49

on, okay?                                                         12:01:54

MR. ANTONIO:  Ms. Audrea Barnes, I just                           12:01:59

want to clarify what he is saying, so you can know                12:02:03

how you're allowed to testify.  So in other words,                12:02:08

he doesn't want to hear about communications that                 12:02:12

you had with him, with him or her, the other                      12:02:19

attorney, or with me.  So in other words, any                     12:02:23

response should not start off with my attorney                    12:02:28

said or I told my attorney.  Does that make sense?                12:02:32

THE WITNESS:  Yes.                                                12:02:39

MR. ANTONIO:  Okay, great.                                        12:02:40

MR. MCCOY:  Thank you.                                            12:02:43

**Q     Okay.  So you were classified as an**                     12:02:56

**exempt salaried business analyst from about**                   12:03:01

**May 2nd, 2022 to November 12th, 2022; is that**                 12:03:05

**about right?**                                                  12:03:11

**A     Roughly, yes.**                                           12:03:12

Q     Okay.  And then, going to what you were                     12:03:14

just referring to, you were reclassified to a                     12:03:16

hourly nonexempt role as a team leader, call                      12:03:22

Q    Can you just generally describe for me what your duties as a business analyst were?

A    For this department, it was IT, business assessment needs for processes for the department and for coding business needs for the business unit.  It has to do with automation.  We had several systems where there's coding and programming and IT to facilitate the needs of the business owner in their units and their employees.

**Q    And was that position remote?**

**A    Yes, sir.**

Q    Did you ever come into a Maximus location to work during your time as a business analyst?

A    No.

Q    So as a salaried-exempt employee, you weren't entitled to overtime compensation; correct?

A    So, that's what I was told.

Q    And you also were not entitled to meal and rest periods; is that right?

A    I'm sorry?

Q    You also were not entitled to meal or rest periods; is that correct?

A    I was entitled to a meal.

salary; correct?

A    Yes.

Q    And did you understand that, when you were hired, you would be employed on what's known as an at-will basis?

A    I believe it was mentioned, at will.

Q    Okay.  And just to refresh your recollection on this exhibit, last paragraph, it says, quote, Your employment with Maximus will be on an at-will basis, which means there is no guarantee of employment for any specific duration, time, and that either you or the company may terminate the employment relationship with or without notice at any time, end quote.

Is that a true statement?

A    I would assume it is.

Q    Do you have any reason to believe that you were not an at-will employee of Maximus?

A    No.

Q    When you were hired as a business analyst, did you get to have any training?

A    Not at Maximus.

Q    Did you receive any training to do your job as a business analyst at Maximus?

A    Yes.

12:18:34
12:18:35
12:18:37
12:18:39
12:18:44
12:18:52
12:18:56
12:18:58
12:19:02
12:19:07
12:19:12
12:19:16
12:19:21
12:19:24
12:19:28
12:19:31
12:19:34
12:19:36
12:19:43
12:19:52
12:20:05
12:20:08
12:20:14
12:20:18
12:20:23

Q    What training was that?

A    Policy.  I didn't know the company policy for the IT Department and what are our scope and expectations for delivery.  So I had to learn the -- the programs that were rolled out for the department, and I had to learn the work scope and the systems.  I had to learn the IT systems to go in to write the programs or to do some coding. So, I read a lot of literature on the department, our purpose, how we go about serving our clients. It's just, like, the scope of work and the expectation because we served internal clients.

Q    Okay.  And so, eventually, you were reclassified to a different role effective November 12th, 2022, thereabouts; is that right?

A    I remember I was removed from my business analyst position at that time to a lead at the call center.

**Q    And when you say at the call center, it was still a remote position, or did you work at a call center?**

**A    It was a remote position.**

MR. MCCOY:  Counsel, did you say something?

MR. ANTONIO:  Sorry.  I made a mistake.

nonexempt hourly employee; is that your understanding?

A    Yes.

Q    Meaning you were paid according to the number of hours that you worked; correct?

A    Yes.

**Q    Were you provided training on Maximus's timekeeping system?**

**A    I think so, because I did have to do the timesheets.**

**Q    And as an hourly employee in your lead role, how did you track your time on those timesheets?**

**A    By putting in the hours I worked on the timesheet.**

**Q    Where were the timesheets located?  Was it digital?  Electronic?  On an app?  Paper?**

**A    It was an application, and you had to put in your time weekly in order to get paid.**

**Q    Where was the application located?  Was it on your computer or on a phone?**

**A    It was inside the Maximus workstation or their program.  It's kind of like a computer platform, where you work in the Maximus environment, and you have all the different**

Transcript of Audrea Barnes
Conducted on April 28, 2026                                70

programs there that you can access, and one of
them was timekeeping.

Q    Were you trained on how to use that
specific application by Maximus?

A    Yes.

Q    Did you have any questions about that
training, or did it make sense to you?

A    I got by.  It made sense.

Q    When you were working at Maximus, you
used a laptop computer; is that correct?

A    Yes.

Q    Whose laptop computer was that?

A    I had Maximus computer that was given to
me when I was hired [sic].  Then I was told I can
keep it going to the phone center.  And a month
after I was in the phone center, they took it away
from me.

Q    And --

A    Management took it away.

Q    Did they tell you why they took it?

A    They claimed they had budget issues.

Q    Budget issues?

A    Yes.

Q    And the -- so how did you -- whose
computer did you then use after you returned the

Transcript of Audrea Barnes
Conducted on April 28, 2026                    71

Maximus computer?

     A     Mine.

     Q     And did you already have that computer, or did you have to buy a new one?

     A     I had to buy a new one.

     Q     And did you submit any paperwork to be expensed for that computer?

     A     No.  Because I was told, if I had to get my own equipment -- a month after I started working at the phone center, I was given a B-Y something.  I was given a tool requirement by my supervisor, and they said they had to take my computer because it was budget issues, and I had to send it back to Maximus, and I had to buy all of my equipment.

     Q     What equipment was that?  The computer?

     A     The computer, the mouse.  I had to get an ethernet.  I had to get headphones.  I can't remember everything.  Mouse pad, Mouse.  There were requirements I had to -- ethernet, ethernet connection cable.  I had to get a microphone.  That's what I recall now.  It could have been more, but that's what I recall as of today.  I had to do, like, a new start of everything, because I had to send back what they told -- what they gave

Transcript of Audrea Barnes
Conducted on April 28, 2026                72

me to use.

Q   Did you have to buy any type of special computer, or just a normal laptop?

A   No.  It didn't say specific.  It had a criteria I had to cover.  It didn't say it had to be a laptop or a desktop, but there were stipulations.  Internet speed.  I can't remember all of the requirements, but I had to buy quite a bit of stuff.

**Q   And prior to buying the new computer for your work at Maximus, did you have another laptop or desktop at home?**

**A   Yes.  But it went out.  How can I say it?  I had one, but it wasn't working, because during the time I had Maximus computer -- yeah. It wasn't working, but I did have one.**

**Q   Had that -- was it a desktop or a laptop?**

**A   Laptop.**

**Q   Had that personal laptop been working, when Maximus took back its own computer, would you have used that laptop for your work at Maximus?**

**A   Yes.  It went out during the time I had Maximus laptop.**

**Q   And the computer that you bought for**

12:32:42
12:32:48
12:32:52
12:32:58
12:33:04
12:33:10
12:33:13
12:33:21
12:33:24
12:33:26
12:33:29
12:33:34
12:33:43
12:33:48
12:33:54
12:34:03
12:34:10
12:34:12
12:34:15
12:34:15
12:34:19
12:34:26
12:34:31
12:34:36
12:34:38

Transcript of Audrea Barnes
Conducted on April 28, 2026                    73

your work at Maximus, do you still have it today?    12:34:41

A    Yes.    12:34:46

Q    And do you still use it?    12:34:47

A    Sometimes.    12:34:49

Q    What do you use it for?    12:34:51

A    E-mails.    12:34:53

Q    When you were employed by Maximus using that computer that you bought, did you use it for purposes other than your work with Maximus?    12:34:59    12:35:02    12:35:06

A    I used it for Maximus, and I did use it for other things, yes.    12:35:17    12:35:22

Q    What types of things did you use it for during your employment?    12:35:25    12:35:27

A    E-mails.    12:35:30

Q    Personal e-mails?    12:35:31

A    Yes.    12:35:33

Q    Anything else?    12:35:34

A    No.    12:35:36

Q    Surfing the Internet?    12:35:37

A    Oh, yeah.  Surfing the Internet, e-mails, yeah.    12:35:39    12:35:42

Q    Social media?    12:35:44

A    That is mainly my phone, social media. I don't put that stuff on my laptop.    12:35:47    12:35:53

Q    Have you ever used social media to    12:35:57

Q   So once you got employed by Maximus, you
had home Internet installed; is that correct?

A   After -- well, when I bought the home,
that's when I got the service, but I didn't buy my
home until 2023.

Q   Okay.  So what Internet did you use
prior to buying your home in 2023?

A   I had to buy an Internet package with my
phone, and they gave me a device.  I'm not with
that carrier anymore.

Q   Like a MyFi thing, like a little box
that --

A   No.  It was a special plan, because the
criteria for Maximus wasn't for what you just
mentioned.  I had a data plan that matched the
criteria that Maximus wanted their employees to
have in working for them.

Q   Did you have that Internet plan in place
before you started working with Maximus?

A   No.  It was given to me once I left my
analyst position and went to the phone center.  A
month later, I got the criteria of what was
expected to be on the phones.

**Q   Okay.  So how did you -- did you request
reimbursement of your Internet costs from Maximus**

**at any point?**

**A    No.** Because I was told those requirements was mandatory for the position, the phone center position, and it was at the expense of the employee [sic].

Q    And I want to go back to your business analyst role. What Internet did you use during that period of time, May of 2022 to November of 2022?

A    I had this plan from my carrier.

Q    Okay.

A    They gave me a device. It's not a hotspot or anything. It's for people that have businesses that travel. I don't know what they call that plan, but they gave me a device that I can hook up my laptop and other devices that I need.

Q    When you say they gave me, who gave it to you?

A    The carrier, the phone carrier.

Q    Okay. And did you ask for that package from them after your job with Maximus began?

A    Yes. Because I was told that's the condition of the job. When they put me in the phone center, they gave me a list. I had to have

Transcript of Audrea Barnes
Conducted on April 28, 2026                    81

and there was other requirements.

Q    Okay.  So focusing in on the timesheets, were you trained that you were required to accurately record your hours worked as an hourly employee?

A    Yes.

Q    And what is this other system you were referring to?

A    Whenever you weren't able to take breaks, when you were expected to finish the call that went into your break, you had to record it on a separate form that Maximus created to capture any deviation from your break and from your lunch periods.

Q    And when you say break, are you referring to the shorter breaks that you would take before and after the meal period?

A    Yes.

Q    And you wouldn't track the rest periods or the rest breaks on your timesheets; is that right?

A    Not on the timesheet, but it was required to note any deviation from your assigned rest periods on a different form, electronic form, in their system.

Transcript of Audrea Barnes
Conducted on April 28, 2026                    82

Q    So you were given the opportunity to correct any inaccurate timekeeping; is that right?

A    No.

Q    Well, if you missed a break, did you record that on this separate document you're referring to?

A    You record it, but you didn't correct it.

**Q    Okay.  For what purpose, then, to your knowledge, would you record it?**

**A    If you didn't take your break at the time that you were required to, if you didn't take your lunch at your appointed time, any deviation from meal breaks and lunch breaks had to be recorded on that exceptions sheet.**

**Q    During your time as an hourly employee, was your lunch period scheduled for you?**

**A    Yes.**

**Q    And who scheduled that meal period for you?**

**A    I don't know who scheduled it, but it was already preprogrammed on your timesheet.**

**Q    So you start your day.  You then clock out for your meal period by the time that it is scheduled for you?**

Transcript of Audrea Barnes
Conducted on April 28, 2026                          83

A     Yes.

Q     And you would take at least a 30-minute meal period?

A     Yes.

Q     And what would you do during that period of time for your meal period typically?

A     Anything that was personal that I needed to do, including eating.

Q     So you would spend that 30-minute period on nonwork-related activities?

A     Yes.

Q     Would you shut off your computer?

A     No.

Q     Would you walk away from your computer?

A     Yes.

Q     Okay.  You'd go somewhere in your house and eat lunch or do personal activities?

A     Yes.

Q     Were there ever any days where you were unable to take that meal period when it was scheduled for you for 30 minutes?

A     A lot of times.

Q     How many times?

A     Don't know exactly, but that information is captured in the exception report that was

Transcript of Audrea Barnes
Conducted on April 28, 2026                    84

**required to submit on each occurrence.**

Q    Do you recall whether you were given a stipend as an expense reimbursement when you were an hourly employee in the call center?

A    No.

Q    Maybe 30 bucks as an expense reimbursement stipend?

A    I don't recall.  We're talking three years ago.  I just don't recall that.

(Exhibit 9 was marked for identification and attached to the transcript.)

Q    I want you to turn, please, to the end. Your production was not Bates numbered, so I apologize.  But if you could turn to the wage statement dated -- for the pay date, July 14th, 2023.  It's near the end of the stack.

A    Is there, like a -- is it in the back? There's a lot of pages here.

Q    Yeah.  It's near the back.

A    Okay.

Q    And in the top right corner it says, Period start date, July 9th, 2023.

A    Okay.  Got it.

Q    Under earnings -- under bonus it says, Expense reim [sic].  And then next to it, it says,

13:00:40
13:00:45
13:00:49
13:00:58
13:01:02
13:01:04
13:01:08
13:01:12
13:01:17
13:01:20
13:01:20
13:01:58
13:02:03
13:02:07
13:02:12
13:02:19
13:02:26
13:02:32
13:02:35
13:02:39
13:02:40
13:02:43
13:03:08
13:03:11
13:03:14

Transcript of Audrea Barnes
Conducted on April 28, 2026                                   85

Stipend.  And it says, Current, 30 bucks.  Do you see that?

A    $30, yes.

Q    Okay.  Does that refresh your recollection that you received a expense reimbursement during your employment with Maximus?

**A    I do recall receiving reimbursement for Internet later on in my -- in my employ there, but they did start sending us checks, but it wasn't -- I think it was six months after employment.  And if I recall correctly, it was not initially done when I was employed.  Later on in my employment, they started sending us monthly checks for Internet, and I think this is what it was for.  I can't validate that, but I know that they were doing so after some months after I started at the company.**

Q    Okay.  Started working at the company, or started working as an exempt employee -- I'm sorry -- a nonexempt employee?

A    Nonexempt.

Q    Okay.  So you were on a leave of absence from May 4th, 2023 until your employment was terminated as a result of the reduction on force in August 4th, 2024; is that right?

Transcript of Audrea Barnes
Conducted on April 28, 2026                    86

A    No.

Q    You were not on a leave of absence?

A    I was on family leave from May 5th.

Q    Okay.

A    And I was terminated August the 4th.

**Q    So you did not work from May 5th, 2023 to August 4th of 2023, right?**

**A    Correct.**

Q    And what was the basis for your leave? What was the reason?

A    Injury and pain.  I had acute pain.

Q    Was that the slip-and-fall?

A    Yes.

Q    Okay.  So if you started in your hourly role in November of 2022, and you went out on leave in May of 2023, do you recall when you started getting the reimbursement checks in that time period?

A    I don't recall exactly.  But I know they started paying us for Internet into my employment. I don't recall the exact month they started, but I know they did start.

Q    Do you know whether reimbursement was one of the claims that was part of the Hercules class-action settlement?

Transcript of Audrea Barnes
Conducted on April 28, 2026                        92

Q    What do you mean by that?  You believe you're owed wages for time you spent working?

A    I believe I was compensated for time I spent working, because I did my timesheets.

Q    And you did them accurately?

A    You want me to finish?

Q    Sorry.  Go ahead.

A    That was for the exempt position -- I mean, the nonexempt position.  And that's what I wanted to highlight.  I do believe I was compensated for work for that time.

Q    As a nonexempt employee?

A    Yes.

Q    So you believe, then, you weren't paid for time that you had for PTO or vacation?

A    I can't validate what happened.  I just know there was a complaint, and they said they had some IT issues.

Q    IT issues relating to what?

A    My time off and inaccurate reporting, non-approval of timesheet.  All that goes into there.  So they had to put in an IT investigative ticket, because my FMLA hours were wrong.  It was really a mess.  They -- it was really botched up.

Q    When did you request FMLA leave?

Transcript of Audrea Barnes
Conducted on April 28, 2026                              93

**A      I requested FMLA leave May 5th, 2023.**

Q    During that period of time, you were on a leave of absence; is that right?

A    Partially.  Because I had Covid right before that.  That's where the mix-up was.

**Q     Okay.  So on May 5th, 2023, what was the reason for your leave of absence?  Was it the injury, or was it Covid?**

**A     May 5th was for the injury, the slip-and-fall.**

Q    Okay.  And when did you contract Covid?

A    Mid April.

Q    Did you go to the physician?

A    Yes.

Q    Did you get a doctor's note and provide that to Maximus?

A    Yes.

Q    And at that period of time, what were you requesting, having contracted Covid in mid-April of 2023?

A    I wanted to get paid, because I had vacation time on the books, and I had sick time on the books.  And that's when my supervisor refused to sign my timesheet.

Q    So you were absent for how long as a

Transcript of Audrea Barnes
Conducted on April 28, 2026                    97

hours and everything.  So I don't know what happened when, but I know it was a problem.

**Q    Do you have any evidence to support any claim that someone deliberately messed up your FMLA leave request?**

**A    No.**  But the communications that I've had back and forth with the absent leave team, and the responses I got, because I had told HR that my supervisor at the time didn't approve my time sheet.  I told him my FMLA hours were wrong.  I was told that I couldn't go on long-term disability.  So there was major problems around that time in all three areas.

Q    Right.  But nothing to suggest someone deliberately interfered with your FMLA request?

A    I can't --

Q    There might have been an IT issue, but no deliberate interference; correct?

A    I work remotely.  I can't say what's deliberate.  I said I don't know if it was deliberate or not.  I work remotely.  But I just find all three areas had major issues, the leave for Covid, which is a protected-class illness, FMLA, that was a problem.  There was a problem with the short-term disability, and they denied me

with the long-term disability.  All three of those within one month took place.

**Q    You were on FMLA leave the entire period of time from May of 2023 until you were included in the reduction in force in August of 2023; is that right?**

**A    Yes.**  I did sign, and my doctor certified on May 5th.

Q    Okay.  And FMLA is unpaid leave; you're aware of that?

A    Yes.

Q    And you also applied for long-term disability benefits?

A    Yes.

Q    And off the top of your head, do you know what period of time you have to be out in order to be eligible for long-term benefits?

A    I don't know the -- the timeline.  I know you've had to satisfy short-term disability first before going to long-term, and I did satisfy the short-term disability period.

Q    So did you make complaints to the company about the alleged behavior of other employees that you believe you suffered?

A    I'm sorry?

Transcript of Audrea Barnes
Conducted on April 28, 2026                104

concern that he may not do it in the future, since he had been spoken to about it?

A    That would have.

Q    Okay.  Do you have any knowledge as to whether or not Mr. Profitt's supervisor told him or counseled him on this issue?

A    I'm not privileged to that information.

Q    So you have one way -- you have no idea one way or the other?

A    No.  He's in Northern California and I'm in Southern California.  I have no idea.

Q    Okay.  If you could look at Page 2, 4, 6, Page 6, the second to last page.

A    Okay.  Is this it?

Q    Uh-huh.  Under Summary of Findings, yes. **In the last paragraph it says, quote, The investigation confirmed that, in frustration during a hot mic moment, Curtis made disparaging and unprofessional remarks about Audrea.  Audrea heard these remarks when Curtis thought he had disconnected from a troubleshooting phone call, but he had not.  As soon as -- as soon as Audrea reported this to her manager, Mai Vang, Mai immediately contacted Curtis's manager, Prudence Duke, who addressed Curtis and issued a verbal**

warning on September 27th, 2022.

Were you aware that Ms. Vang had spoken to Ms. Duke and that Ms. Duke had verbally counseled Mr. Profitt about this incident?

A    No.

Q    Does this now satisfy your concern, this incident had been addressed at the time, and, in fact, immediately after you reported it to Ms. Vang?

A    Yes.  Because when she told me she didn't want to hear it, and now that I'm reading this today, after I'm fired, it's nice to know. But it did -- it didn't satisfy the situation at hand at the time of the incident.

Q    Were you aware that, in certain corrective action taken by employers for the behavior of other employees, is confidential and something that you would not be entitled to?

A    Yes.

Q    So then, would it surprise you to learn that the company would not tell you about what it had done to address Mr. Profitt's behavior?

A    No.  It does not surprise me.

Q    Because it would be confidential; correct?

Transcript of Audrea Barnes
Conducted on April 28, 2026                    127

the company's normal protocol is with respect to
passwords, to your knowledge?

A    I wasn't aware of it.

(Exhibit 12 was marked for
identification and attached to the transcript.)

Q    Do you recognize this e-mail,
Ms. Barnes?

A    Yes.

Q    Okay.  Is this an accurate description
of what Mr. Allen said to you about saying Merry
Christmas and God bless?

A    Yes.

Q    And did Mr. Allen ultimately discipline
you, aside from this message that quote, Audrea,
FYI, you should use happy holiday in a business
setting.  This is especially true if you are
speaking with a customer.  Everyone doesn't
celebrate the same?

Is that all Mr. Hill said to you --
Mr. Allen said to you with respect to you saying
Merry Christmas at the workplace?

A    I'm not sure if this is the only thing,
but I do recall this, yes.

Q    So Mr. Allen just counseled you to not
say this in a business setting because not

Transcript of Audrea Barnes
Conducted on April 28, 2026                                128

everybody celebrates Christmas, right?

A    Yes.

Q    And to your knowledge, you're not aware as to whether or not Mr. Allen had similar conversations with other employees at Maximus about their use of Merry Christmas, right?

A    No.

(Exhibit 13 was marked for identification and attached to the transcript.)

Q    Do you recognize this e-mail from Ms. Hamilton on January 26th, 2023?

A    Let me review it, please.  Possibly.  We had so many back and forth.  I had a lot of communications back and forth with her, so I can't remember this particular e-mail, but I have no doubt to believe it's not accurate.

Q    Okay.  And this e-mail generally summarizes the same factual findings that we just went over from the hotline report, right?

A    The IT incident, see here, PTO, Merry Christmas, bring your own device, yes.

Q    So does this reflect your recollection that Maximus investigated the complaints that you made and followed up with you about the conclusion of those investigations, even if they did not tell

**you what specific counseling was taken with**

**respect to other employees?**

    **A   Yes.**

    Q   Did you have any questions to Ms. Hamilton about how this investigation was handled?

    A   Did I or do I?

    Q   Did you during your employment?

    A   I don't recall if I did.  I know there was one issue that I took exception to, and I think I mentioned it to Ms. Hamilton.

    Q   What exception did you take?

    A   There was a lady in my unit who was pregnant, and she used to take off quite a bit to go to the doctor during her pregnancy, and she could make up her time without docking PTO.  And I remember you had mentioned in a writing or over the phone why I was not given that same opportunity instead of doing -- instead of listing PTO for my right to vote in person.

    Q   Well, time off to vote is different than time off to go see a doctor for a pregnancy, right?

    A   I don't know.  But that wasn't the issue at hand that you're speaking about.  It's the

you believe that there are other Teams messages relating to the voting issue?

A    No.  There's no Team message, I don't believe.

(Exhibit 14 was marked for identification and attached to the transcript.)

A    Thank you.

Q    Do you recognize this document?

A    Yes.

Q    And this is the notice that you -- your employment was going to be terminated due to, quote, Lack of work, end quote; correct?

A    That's what this said.

Q    And when you received this notice you were on a leave of absence, right?

A    Yes.

Q    And at that period of time, you were unable to work; is that right?

A    Yes.

Q    Did you contact anybody at the company about this notice that you received?

A    I can't remember if I did or not.

**Q    Do you have any reason to believe that the termination reason provided to you, namely, quote, Lack of work, is incorrect?**

14:47:44
14:47:49
14:47:53
14:47:57
14:48:58
14:48:58
14:48:58
14:48:59
14:49:19
14:49:21
14:49:24
14:49:29
14:49:33
14:49:36
14:49:38
14:49:41
14:49:43
14:49:45
14:49:48
14:49:50
14:49:54
14:49:59
14:50:04
14:50:06
14:50:12

Transcript of Audrea Barnes
Conducted on April 28, 2026                                    135

**A      I don't know because I can't validate**
**that, if it's factual or not.**                              14:50:16 14:50:21

**Q      You have no reason or evidence to**
**disprove the reason that was provided to you?**              14:50:24 14:50:29

**A      I have no evidence to disprove.**                      14:50:34

Q      Are you aware of how many employees were
impacted by the RIF?                                           14:51:01 14:51:05

A      I don't recall.                                         14:51:10

Q      Are you aware that 53 or so, some other,
employees were included in reduction in force at
this time?                                                     14:51:12 14:51:17 14:51:21

A      I don't recall the number.                              14:51:24

Q      Are you aware that a total of seven call
center team leaders were impacted by the RIF?                  14:51:26 14:51:30

A      I don't remember that number.                           14:51:36

Q      So ultimately, you and six other call
center team leaders were included in the RIF?                  14:51:41 14:51:46

A      I just don't remember the number.                       14:51:53

Q      Have you spoken to any of those call
center team leaders who were part of the RIF?                  14:51:56 14:52:00

A      I don't know who they were.                             14:52:05

MR. MCCOY:  Let's go off the record real
quick.                                                         14:53:10 14:53:13

THE VIDEOGRAPHER:  Please stand by.
We're going off the record.  The time is 1:20 p.m.             14:53:14 14:53:16

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC


        I, Daniel Esparza, the officer before
whom the foregoing proceedings were taken, do
hereby certify that said proceedings were
electronically recorded by me; that the foregoing
transcript, to the best of my ability, knowledge,
and belief, is a true and accurate record of the
proceedings; and that I am neither counsel for,
related to, nor employed by any of the parties to
this case and have no interest, financial or
otherwise, in its outcome.



DANIEL ESPARZA, NOTARY PUBLIC FOR
FOR THE STATE OF CALIFORNIA

CERTIFICATE OF TRANSCRIBER


        I, Jacalyn Mann, do hereby certify that
the foregoing pages, to the best of my ability,
are a true and correct transcription from the
official electronic sound recording and
annotations of the proceeding taken on April 28,
2026, in the above-entitled matter; and that I am
neither counsel for, related to, nor employed by
any of the parties to the case and have no
interest, financial or otherwise, in its outcome.


*Jacalyn Mann*

Jacalyn Mann
May 1, 2026.

TAB 3

# EXHIBIT 12

Case 5:25-cv-02108-KK-SP    Document 36    Filed 06/04/26    Page 53 of 142   Page ID #:472

 **Gmail**

Audrea CMP <audreacmp@gmail.com>

## Reprimanded by Dion Allen for saying...."Merry Christmas everyone" during our staff meeting on 12/19...2:44 p.m.

4 messages

**Barnes, Audrea** <AudreaBarnes@maximus.com>                    Mon, Dec 26, 2022 at 3:45 PM
To: "Hamilton, Paula" <PaulaHamilton@maximus.com>

See other coworkers under Dion's supervision using the phrase:  Merry Christmas...as well, other CSR and Leads use the word and phrase Merry Christmas under a separate email.

[12/19 2:51 PM] Allen, Dion

Audrea, FYI you should use Happy Holiday in a business sitting.  This is especially true if you are speaking with a customer.  Everyone doesn't celebrate the same.

[12/19 2:52 PM] Barnes, Audrea

Eventhough, our company uses the word Christmas as a holiday on the Calendar and in employee handbook?

[12/19 2:54 PM] Allen, Dion

Yes





**Audrea Barnes**
Analyst - Bus Analysis
HLTH WEST/CA HF

# maximus    E: audreabarnes@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

---

**Barnes, Audrea** <AudreaBarnes@maximus.com>                              Thu, May 4, 2023 at 11:58 AM
To: "audreacmp@gmail.com" <audreacmp@gmail.com>

---

**From:** Barnes, Audrea
**Sent:** Monday, December 26, 2022 3:45 PM
**To:** Hamilton, Paula <PaulaHamilton@maximus.com>
**Subject:** Reprimanded by Dion Allen for saying...."Merry Christmas everyone" during our staff meeting on 12/19...2:44 p.m.

See other coworkers under Dion's supervision using the phrase: Merry Christmas...as well, other CSR and Leads use the word and phrase Merry Christmas under a separate email.

[12/19 2:51 PM] Allen, Dion

Audrea, FYI you should use Happy Holiday in a business sitting. This is especially true if you are speaking with a customer. Everyone doesn't celebrate the same.

[12/19 2:52 PM] Barnes, Audrea

Eventhough, our company uses the word Christmas as a holiday on the Calendar and in employee handbook?

[12/19 2:54 PM] Allen, Dion

Yes

9/11/23, 2:42 PM
Case 5:25-cv-02108-KK-SP    Document 36    Filed 06/04/26    Page 55 of 142   Page ID
Gmail - Reprimanded by Dion Allen for saying...."Merry Christmas everyone" during our staff meeting on 12/19...2:44 p.m.
#:474



**Audrea Barnes**
Analyst - Bus Analysis
HLTH WEST/CA HF

# maximus   E: audreabarnes@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

---

**Audrea CMP** <audreacmp@gmail.com>                          Thu, May 4, 2023 at 11:59 AM
To: intake@tomorrowlaw.com

To Natalie:

These are the transcripts from my reprimand for say the word Merry Christmas everyone in my staff meeting.

Audrea Barnes

---------- Forwarded message ---------
From: **Barnes, Audrea** <AudreaBarnes@maximus.com>
Date: Mon, Dec 26, 2022, 3:45 PM
Subject: Reprimanded by Dion Allen for saying...."Merry Christmas everyone" during our staff meeting on 12/19...2:44 p.m.
To: Hamilton, Paula <PaulaHamilton@maximus.com>

See other coworkers under Dion's supervision using the phrase:  Merry Christmas...as well, other CSR and Leads use the word and phrase Merry Christmas under a separate email.

[12/19 2:51 PM] Allen, Dion

9/11/23, 2:42 PM     Gmail - Reprimanded by Dion Allen for saying...."Merry Christmas everyone" during our staff meeting on 12/19 2:44 p.m.

Case 5:25-cv-02108-KK-SP    Document 36    Filed 06/04/26    Page 56 of 142    Page ID #:475

Audrea, FYI you should use Happy Holiday in a business sitting. This is especially true if you are speaking with a customer. Everyone doesn't celebrate the same.

[12/19 2:52 PM] Barnes, Audrea

Eventhough, our company uses the word Christmas as a holiday on the Calendar and in employee handbook?

[12/19 2:54 PM] Allen, Dion

Yes

**Audrea Barnes**
Analyst - Bus Analysis
HLTH WEST/CA HF

**E:** audreabarnes@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

**4 attachments**



**maximus**    d216bf0d-b5dc-4b5a-8f08-148254f02753_Templafy-e-logo_JPG.jpg
18K

**image.png**
165K

**image.png**
165K

# maximus

**d216bf0d-b5dc-4b5a-8f08-148254f02753_Templafy-e-logo_JPG.jpg**
18K

---

**Audrea CMP** <audreacmp@gmail.com>                                        Wed, Jun 21, 2023 at 8:44 PM
To: Blanca Martinez <reception@allisonschulman.com>
Cc: Audrea CMP <Audreacmp@gmail.com>

I was reprimanded verbally and in writing for using the words Christmas, God, Jesus and Bless you during the Christmas season.  Even Though Christmas is used in the employee's handbook, company's holiday calendar, and by other supervisors and Team Leads in the company.  This reprimand was strictly retaliation against me for filing several complaints with against my VP and other coworker.

---------- Forwarded message ---------
From: **Barnes, Audrea** <AudreaBarnes@maximus.com>
Date: Mon, Dec 26, 2022 at 3:45 PM
Subject: Reprimanded by Dion Allen for saying...."Merry Christmas everyone" during our staff meeting on 12/19...2:44 p.m.
To: Hamilton, Paula <PaulaHamilton@maximus.com>

See other coworkers under Dion's supervision using the phrase:  Merry Christmas...as well, other CSR and Leads use the word and phrase Merry Christmas under a separate email.

[12/19 2:51 PM] Allen, Dion

Audrea, FYI you should use Happy Holiday in a business sitting.  This is especially true if you are speaking with a customer.  Everyone doesn't celebrate the same.

[12/19 2:52 PM] Barnes, Audrea

Eventhough, our company uses the word Christmas as a holiday on the Calendar and in employee handbook?

[12/19 2:54 PM] Allen, Dion

Yes

Case 5:25-cv-02108-KK-SP Document 36 Filed 06/04/26 Page 58 of 142 Page ID #:477



**Audrea Barnes**
Analyst - Bus Analysis
HLTH WEST/CA HF

**maximus**   E: audreabarnes@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

# TAB 4

# EXHIBIT 13

 **Gmail**

**Audrea CMP <audreacmp@gmail.com>**

## Fw: Second Follow Up

3 messages

**Barnes, Audrea** <AudreaBarnes@maximus.com>                          Thu, Jan 26, 2023 at 7:43 PM
To: "audreacmp@gmail.com" <audreacmp@gmail.com>

**From:** Hamilton, Paula <PaulaHamilton@maximus.com>
**Sent:** Thursday, January 26, 2023 6:04 AM
**To:** Barnes, Audrea <AudreaBarnes@maximus.com>
**Subject:** Second Follow Up



**EXHIBIT**

**13**

**Planet Depos, LLC**

Hi Audrea - Thank you for filing your report and for your patience while your report was being investigated.  You brought forth multiple serious allegations.  This contributed to the time required to conduct a thorough investigation which is now complete.  This e-mail will address your remaining concerns that were not addressed in the follow up last week.  Ethics investigations are kept confidential to the fullest extent possible.  Details can only be shared on a limited basis.  You may not be able to see what occurred, but please understand that when any action is taken on an internal complaint or ethics helpline complaint, it remains confidential.

- The IT incident that you reported to your manager in September 2022 was investigated by leadership when you originally reported it and again with your recent report to Ethics.  Appropriate action was taken at that time.  Actions taken which involve other employees cannot be shared.

- Your password was changed within compliance by IT as part of the ticket/troubleshooting process.  There was no unauthorized use of your credentials

- Attached is the Maximus policy for voting.  You were approved 2 hours of PTO to vote in person.  Appropriate action has been taken.  Actions taken which involve other employees cannot be shared.

- There is no Maximus Policy prohibiting the greeting Merry Christmas.  CDPH expects employees to remain as neutral and secular as possible with clients, which includes avoiding statements such as Merry Christmas or God Bless You.  For internal employee communication within Maximus, it is recommended that employees follow the same general guidance in consideration of diversity, inclusivity and beliefs of others.   No employee received formal discipline or corrective action over the Holiday season. Non-formal individual coaching or guidance is appropriate in this situation.

- TLs and CSRs working on the CDPH contract are operating under BYOD (Bring Your Own Device) guidelines.  Only the first 100 employees who were originally hired at the start of the contract were issued Maximus equipment and if any of those employees are still employed, they are working on original Maximus issued desktops.  You were asked to return the Maximus laptop from your temporary Business Analyst position in accordance with BYOD.

Thank you again for your patience with both the length of the investigation as well as the two-part follow up.  Please reach out to HR Director Ruby Williams for any continued employee relations concerns.

**Paula Hamilton**

Global Ethics and Compliance Lead

  **O:** 703-997-9238

**E:** paulahamilton@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

**Voting.pdf**
115K

---

**Barnes, Audrea** <AudreaBarnes@maximus.com>                          Wed, Jun 21, 2023 at 10:35 PM
To: "audreacmp@gmail.com" <audreacmp@gmail.com>

---

**From:** Hamilton, Paula <PaulaHamilton@maximus.com>
**Sent:** Thursday, January 26, 2023 6:04 AM
**To:** Barnes, Audrea <AudreaBarnes@maximus.com>
**Subject:** Second Follow Up

Hi Audrea - Thank you for filing your report and for your patience while your report was being investigated. You brought forth multiple serious allegations. This contributed to the time required to conduct a thorough investigation which is now complete. This e-mail will address your remaining concerns that were not addressed in the follow up last week. Ethics investigations are kept confidential to the fullest extent possible. Details can only be shared on a limited basis. You may not be able to see what occurred, but please understand that when any action is taken on an internal complaint or ethics helpline complaint, it remains confidential.

• The IT incident that you reported to your manager in September 2022 was investigated by leadership when you originally reported it and again with your recent report to Ethics. Appropriate action was taken at that time. Actions taken which involve other employees cannot be shared.

• Your password was changed within compliance by IT as part of the ticket/troubleshooting process. There was no unauthorized use of your credentials

• Attached is the Maximus policy for voting. You were approved 2 hours of PTO to vote in person. Appropriate action has been taken. Actions taken which involve other employees cannot be shared.

• There is no Maximus Policy prohibiting the greeting Merry Christmas. CDPH expects employees to remain as neutral and secular as possible with clients, which includes avoiding statements such as Merry Christmas or God Bless You. For internal employee communication within Maximus, it is recommended that employees follow the same

general guidance in consideration of diversity, inclusivity and beliefs of others.   No employee received formal discipline or corrective action over the Holiday season. Non-formal individual coaching or guidance is appropriate in this situation.

- TLs and CSRs working on the CDPH contract are operating under BYOD (Bring Your Own Device) guidelines. Only the first 100 employees who were originally hired at the start of the contract were issued Maximus equipment and if any of those employees are still employed, they are working on original Maximus issued desktops.  You were asked to return the Maximus laptop from your temporary Business Analyst position in accordance with BYOD.

Thank you again for your patience with both the length of the investigation as well as the two-part follow up.  Please reach out to HR Director Ruby Williams for any continued employee relations concerns.

**Paula Hamilton**

Global Ethics and Compliance Lead



**O:** 703-997-9238

**E:** paulahamilton@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

📄 **Voting.pdf**
115K

---

**Barnes, Audrea** <AudreaBarnes@maximus.com>                          Thu, Jul 6, 2023 at 4:49 PM
To: "audreacmp@gmail.com" <audreacmp@gmail.com>

---

**From:** Hamilton, Paula <PaulaHamilton@maximus.com>
**Sent:** Thursday, January 26, 2023 6:04 AM
**To:** Barnes, Audrea <AudreaBarnes@maximus.com>
**Subject:** Second Follow Up

Hi Audrea - Thank you for filing your report and for your patience while your report was being investigated.  You brought forth multiple serious allegations.  This contributed to the time required to conduct a thorough investigation which is now complete.  This e-mail will address your remaining concerns that were not addressed in the follow up last week.  Ethics investigations are kept confidential to the fullest extent possible.  Details can only be shared on a limited basis.  You may not be able to see what occurred, but please understand that when any action is taken on an internal complaint or ethics helpline complaint, it remains confidential.

- The IT incident that you reported to your manager in September 2022 was investigated by leadership when you originally reported it and again with your recent report to Ethics.  Appropriate action was taken at that time.  Actions

taken which involve other employees cannot be shared.

- Your password was changed within compliance by IT as part of the ticket/troubleshooting process.  There was no unauthorized use of your credentials

- Attached is the Maximus policy for voting.  You were **approved** 2 hours of PTO to vote in person.  Appropriate action has been taken.  Actions taken which involve other employees cannot be shared.

- There is no Maximus Policy prohibiting the greeting Merry Christmas.  CDPH expects employees to remain as neutral and secular as possible with clients, which includes avoiding statements such as Merry Christmas or God Bless You.  For internal employee communication within Maximus, it is recommended that employees follow the same general guidance in consideration of diversity, inclusivity and beliefs of others.   No employee received formal discipline or corrective action over the Holiday season. Non-formal individual coaching or guidance is appropriate in this situation.

- TLs and CSRs working on the CDPH contract are operating under BYOD (Bring Your Own Device) guidelines.  Only the first 100 employees who were originally hired at the start of the contract were issued Maximus equipment and if any of those employees are still employed, they are working on original Maximus issued desktops.  You were asked to return the Maximus laptop from your temporary Business Analyst position in accordance with BYOD.

Thank you again for your patience with both the length of the investigation as well as the two-part follow up.  **Please reach out to HR Director Ruby Williams for any continued employee relations concerns.**

**Paula Hamilton**

Global Ethics and Compliance Lead



**O:** 703-997-9238

**E:** paulahamilton@maximus.com

CONFIDENTIALITY NOTICE: This e-mail, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies and the original message.

📄 **Voting.pdf**
115K

# TAB 5

SEYFARTH SHAW LLP
Ryan McCoy (SBN 276026)
rmccoy@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:  (415) 397-2823
Facsimile:   (415) 397-8549

SEYFARTH SHAW LLP
Reiko Furuta (SBN 169206)
rfuruta@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:  (310) 277-7200
Facsimile:   (310) 201-5219

Attorneys for Defendant
MAXIMUS CONSULTING SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUDREA BARNES,<br><br>              Plaintiff,<br><br>        v.<br><br>MAXIMUS CONSULTING SERVICES, INC.; and DOES 1 through 30; inclusive,<br><br>              Defendants. | Case No. 5:25-cv-02108-KK-SP<br><br>**DECLARATION OF RUBY WILLIAMS IN SUPPORT OF DEFENDANT MAXIMUS CONSULTING SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>(Riverside County Superior Court Case No. CVPS2504251)<br><br>Date:  July 2, 2026<br>Time:  9:30 a.m.<br>Ctrm.:  3<br><br>Complaint Filed:  July 2, 2025<br>FAC Filed:  December 3, 2025<br><br>Trial Date:  None Set |

DECLARATION OF WILLIAMS ISO MOTION FOR SUMMARY JUDGMENT

I, Ruby Williams, declare:

1.     I am the HRBP Director for Maximus, Inc. ("Maximus"), the ultimate parent company of Maximus Consulting Services, Inc. ("Defendant").  I have been employed as the HRBP Director with Maximus since January 1, 1997.  I am over the age of 18 and I make this declaration based on my personal knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.  If called to do so, I could and would testify competently thereto.

2.     In my position, I have access to all of the corporate policy information that is included in this declaration.  I am authorized to review personnel files and am familiar with Maximus's human resources and payroll functions. I have access to payroll records for Plaintiff Audrea Barnes ("Plaintiff") and personnel-related information for her.

3.     Maximus is a leading global government services company specializing in providing business process services, technology solutions, and consulting services to government health and human services agencies.

4.     The company operates on a global scale, offering federal, state, and local governments in the United States and internationally the ability to implement programs rapidly with scalable operations and automated systems.

5.     Maximus partners with governmental entities to operate call centers for them. Personnel at those call centers handle inquiries for state health programs.

6.     Maximus also employs staff who handle administrative tasks relating to appeals of decisions relating to those health programs, including reviewing and processing appeals, communicating with involved parties, and ensuring proper documentation.

7.     Maximus's Overtime Policy provides that non-exempt employees receive overtime in accordance with federal and state wage and hour restrictions. Employees are responsible for accurately reporting all working hours on their timesheets, and that the timely and accurate submission of timesheets is critical. When employees receive their paycheck, they are required to verify immediately that they were paid correctly for all

2

DECLARATION OF WILLIAMS ISO MOTION FOR SUMMARY JUDGMENT

regular and overtime hours. A copy of Maximus's Employee Handbook in effect during Plaintiff's employment is attached as **Exhibit A**.

8.     California employees are required to take their first meal period by the end of their fifth hour of work. If an employee passes the fifth hour of work without taking a meal period, that would be considered a meal violation. Employees cannot waive their meal period if they work more than six hours in a shift. A second meal period is required if employees work more than ten hours, but they can only waive their second meal period if they work less than 12 hours in a shift.  Employees are relieved of all duties during meal periods.

9.     Employees are entitled to one paid 15 minute rest break if they work a shift longer than 3.5 hour, two paid rest breaks if they work a shift longer than six hours, and three paid rest breaks if they work a shift longer than 10 hours.

10.     Consistent with its policies, Maximus trains non-exempt employees, including Plaintiff, to record all time worked, including overtime, and prohibits off-the-clock work. Maximus maintains a process for employees to report missed, late, or interrupted meal periods and rest periods, and employees are paid premiums when a qualifying exception is reported.

11.     On May 2, 2022, Maximus hired Plaintiff as an exempt Limited Service Full-Time Business Analyst out of Maximus's Folsom location. Plaintiff was supervised in this position by Mai Vang.

12.     On or about November 13, 2022, Plaintiff's position as a Business Analyst ceased and she was reassigned to work at Maximus's California Health West Division Call Center as a non-exempt Team Leader. As a Team Leader, Plaintiff was supervised by Dion Allen beginning in December 2022.

13.     On December 7, 2022, Plaintiff submitted a complaint through Maximus's Ethics Hotline portal against an IT Technician and Ms. Vang.  A copy of the case investigation opened is attached as **Exhibit B.**

14.     On or about May 4, 2023 Plaintiff went on leave due to an injury to her leg

3

DECLARATION OF WILLIAMS ISO MOTION FOR SUMMARY JUDGMENT

and hip and submitted a request for a medical leave of absence. Maximus approved Plaintiff's request for a medical leave of absence up to June 23, 2023. A copy of the email approving the medical leave of absence is attached as **Exhibit C**.

15.    Plaintiff made two requests to extend her medical leave on June 24 and July 25, both of which were approved by Maximus, and remained on approved leave through the date her position was eliminated in August 2023. A copy of Plaintiff's Worker History which lists the two extension requests is attached as **Exhibit D**.

16.    As part of a company-wide reduction in force, Maximus eliminated Plaintiff's job position and terminated her employment on August 4, 2023.

17.    Maximus has no record that it received a request for Plaintiff's personnel and payroll records on or about April 23, 2025.

18.    Maximus received a request for Plaintiff's personnel file and payroll records on January 9, 2024 and timely responded to Plaintiff's counsel with the responsive documents on January 22, 2024 and January 29, 2024. A copy of Plaintiff's counsel's records request is attached as **Exhibit E**.

19.    Mr. Allen managed Team Leaders and Customer Service Representatives at Maximus's California Health West Division Call Center. The HR representatives who made the termination decisions regarding the employees at the Health West Division Call Center were responsible for ensure compliance with labor laws, maintaining employee records, and supporting daily administrative HR functions. Neither Mr. Allen nor the HR representatives who made Plaintiff's termination decision were a managing agent, officer, or director of Maximus and they lacked authority to set corporate policy for a substantial portion of the company.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this __4th__ day of June 2026 in Antelope, California.

_Ruby Williams_
Ruby Williams

4

DECLARATION OF WILLIAMS ISO MOTION FOR SUMMARY JUDGMENT

TAB 6

# EXHIBIT A

**maximus**



# Employee Handbook

February 2023

# Table of Contents

## Working at Maximus

Employment at Will ........................................... 6
Pay Transparency
Nondiscrimination Provision ........................... 6
Background Checks........................................... 6
Drug Testing .................................................... 7
Employee Types ............................................... 8
Employment Verifications................................ 8
Former Employees ........................................... 9
Hiring Relatives............................................... 9
Job Postings.................................................... 9
Local Employment Requirements.................... 10
Outside Employment ...................................... 10
Personnel Files .............................................. 10

## Time Charging and Payroll

Attendance and Punctuality ............................ 11
Exempt Employee Compensation................... 11
Review Your Pay Stub .................................... 12
Meal Periods.................................................. 12
On-Call Pay.................................................... 12
Overtime ........................................................ 12
Timekeeping................................................... 13
Workweek and Pay Period.............................. 13

## Ethics and Compliance

Americans with
Disabilities Act & VEVRAA.............................. 14
Conflicts of Interest ........................................ 14
Employee Disclosures .................................... 14
Complaint Procedure ..................................... 15
Ethics and Compliance Training,
Whistleblowing and Ethics Hotline................. 15
Gifts & Entertainment..................................... 16
Harassment and Discrimination....................... 16
Information Requests ...................................... 17
Insider Trading................................................ 17
No Solicitation Policy ..................................... 17
Privacy .......................................................... 18
Transgender and Gender
Non-Conforming Inclusion Policy................... 18

## Facility and Emergency Preparedness

Badges and Visitors........................................ 19
Dress for Success............................................ 19
Drug and Alcohol-Free Workplace.................. 19
Severe Weather or Emergency Conditions ..... 20
Use of Tobacco Products................................ 20
Workplace Safety and Security........................ 20
Facility Access when not on Duty.................... 21
Violence in the Workplace.............................. 21
Lactation/Breastfeeding Breaks Policy ........... 21
Accommodation for Lactating Mothers........... 21

## CORE Benefits Program

Accommodations and Leave ........................... 22
Executive Time off (ETO)................................ 22
Group Health Insurance, Wellness
and 401(k) Benefits........................................ 23
MaxClub now MAXCore Program Policy......... 23
MAXDollars .................................................... 23
Paid Holidays................................................. 23
Paid Time Off................................................. 23
Performance Management — Bonuses........... 24
Performance Management —
Merit Based Pay Adjustments......................... 24
Remote Worker Policy .................................... 24
Referral Bonus ............................................... 24
Severance ...................................................... 25
Sick Leave...................................................... 26
Workers Compensation .................................. 26
Professional Development
& Licensure Support....................................... 26
SCA Purchased Paid Time Off........................ 27
Veteran Compensation and Pension Leave..... 29

## Technology and Use

Use of Equipment........................................... 30
Computer and Internet Usage ........................ 30
Use of Personal Cell Phones........................... 30

## Branding and Media

Business Use of Social Media ......................... 31
Logo Use and Brand Standards....................... 31
Media ............................................................ 31
Personal Use of Social Media ......................... 31
Press Releases ............................................... 32

© 2023 Maximus, Inc.  All Rights Reserved

# Welcome

Welcome to Maximus! We are delighted that you have chosen to join our organization and hope that you will enjoy a long and successful career with us. As you become familiar with our culture and mission, we hope you will take advantage of opportunities to enhance your career and further Maximus' goals.

Maximus as a federal contractor, is an equal employment opportunity and affirmative action employer subject to Executive Order 11246, as amended (EO), Section 503 of the Rehabilitation Act of 1973, as amended (Section 503) and the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended (VEVRAA).

You are joining an organization that has a reputation for outstanding leadership, innovation, and expertise. Our employees use their creativity and talent to invent new solutions, meet new demands, and offer the most effective services/products in the industry. With your active involvement, creativity, and support, Maximus will continue to achieve its goals. We sincerely hope you will take pride in being an important part of Maximus success.

Please take time to review the policies contained in this handbook. If you have questions, feel free to ask your supervisor or to contact the Human Resources department.

# Affirmative Action and Equal Opportunity Policy Statement

It is the policy of Maximus to employ qualified persons of the greatest ability without discrimination against any employee or applicant for employment because of age, ancestry, color, gender, gender identity and gender expression, genetic information, marital status, medical condition, mental or physical disability, U.S. military or veteran status, national origin (including language use), race, religious creed (including religious dress and grooming practices), sex (including pregnancy, childbirth, breastfeeding), sexual orientation, citizenship status, or any other status protected by law, except where gender is a bona fide occupational requirement.

Maximus is committed to this policy and takes affirmative action to employ and advance in employment all qualified minorities, women, individuals with disabilities, and protected U.S. veterans.

As President and Chief Executive Officer, I am committed to the principles of Affirmative Action and Equal Employment Opportunity (EEO). In order to ensure dissemination and implementation of EEO and affirmative action throughout all levels of the Company, I have designated Melissa Boozer, Director of Human Resources, as the Equal Employment Opportunity (EEO) Officer for Maximus. One of the EEO Officer's duties is to establish and maintain an internal audit and reporting system to allow for the effective measurement of Maximus programs. In furtherance of Maximus policy regarding EEO and affirmative action, Maximus has developed written Affirmative Action Programs which sets forth the

policies, practices and procedures that Maximus is committed to in order to ensure that its policy of nondiscrimination and affirmative action for qualified minorities, qualified females, qualified individuals with disabilities, and qualified protected veterans is accomplished.

To implement this policy, Maximus has established Affirmative Action Programs by which we will undertake that we will:

1. Recruit, hire, train and promote qualified persons in all job titles, without regard to age, ancestry, color, gender, gender identity and gender expression, genetic information, marital status, medical condition, mental or physical disability, U.S. military or veteran status, national origin (including language use), race, religious creed (including religious dress and grooming practices), sex(including pregnancy, childbirth, breastfeeding), sexual orientation, citizenship status, or any other status protected by law, except where gender is a bona fide occupational requirement.
2. Base decisions on employment so as to further the principle of equal employment opportunity;
3. Ensure that employment decisions are in accord with principles of equal employment opportunity by imposing only valid job requirements;
4. Ensure that all personnel actions such as compensation, benefits ,transfer, layoff, return from layoff, company- sponsored training, education, tuition assistance, social and recreation programs will be administered without regard to age, ancestry, color, gender, gender identity and gender expression, genetic information, marital status, medical condition, mental or physical disability, U.S. military or veteran status, national origin (including language use),race, religious creed (including religious dress and grooming practices), sex (including pregnancy, childbirth, breastfeeding),sexual orientation, citizenship status, or any other status protected by law, except where gender is a bona fide occupational requirement, or where disability is a bona fide occupational disqualification.

The successful achievement of a nondiscriminatory employment program requires a maximum of cooperation between management and employees. In fulfilling its part in this cooperative effort, management is obliged to lead the way by establishing and implementing affirmative procedures and practices which will ensure our objective, namely, equitable employment opportunities for all.

Employees and applicants shall not be subjected to harassment, intimidation, threats, coercion or discrimination because they have: (1) filed a complaint; (2)assisted or participated in an investigation, compliance review hearing or any other activity related to the administration of any federal, state or local law requiring equal employment opportunity; (3) opposed any act or practice made unlawful by any federal, state or local law requiring equal opportunity or (4)exercised any other right protected by federal, state or local law requiring equal opportunity.

Maximus is dedicated to responding promptly and appropriately to any acts of harassment, discrimination or retaliation; to maintaining a disciplinary system that is designed to deter acts of harassment, discrimination or retaliation; and to maintaining a work environment for its workers that encourages respect and dignity. Any employee found to have engaged in conduct inconsistent with this policy will be subject to discipline, up to and including termination.

If you, as one of our employees or as an applicant for employment, have any questions about this policy or would like to be considered under our Affirmative Action Plan, or would like to view the Affirmative Action Program for Individuals with Disabilities and Protected Veterans, please contact the EEO Officer during regular business hours.

I have reviewed and fully endorse our Affirmative Action and Equal Employment Opportunity program. In closing, I ask the continued assistance and support of all Maximus personnel to attain our objective of equal employment opportunity for all.

**Bruce Caswell**
President and Chief Executive Officer

# Working at Maximus

## Employment at Will

Employment at Maximus is on an at-will basis unless otherwise stated in a written individual employment agreement signed by the President of the company.

This means that either the employee or the company may terminate the employment relationship at any time, for any reason, with or without notice.

Nothing in this employee handbook is intended to or creates an employment agreement, express, or implied. Nothing contained in this or any other document provided to the employee is intended to be, nor should it be, construed as a contract that employment or any benefit will be continued for any period of time. In addition, no company representative is authorized to modify this policy for any employee or to enter into any agreement, oral or written, that changes the at-will relationship.

Any salary figures provided to an employee in annual or monthly terms are stated for the sake of convenience or to facilitate comparisons and are not intended and do not create an employment contract for any specific period of time.

Nothing in this statement is intended to interfere with, restrain, or prevent concerted activity as protected by the National Labor Relations Act. Such activity includes employee communications regarding wages, hours, or other terms or conditions of employment. Maximus employees have the right to engage in or refrain from such activities.

## Pay Transparency Nondiscrimination Provision

The contractor will not discharge or in any other manner discriminate against employees or applicants because they have inquired about, discussed, or disclosed their own pay or the pay of another employee or applicant. However, employees who have access to the compensation information of other employees or applicants as a part of their essential job functions cannot disclose the pay of other employees or applicants to individuals who do not otherwise have access to compensation information, unless the disclosure is (a) in response to a formal complaint or charge, (b) in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or (c) consistent with the contractor's legal duty to furnish information. 41 CFR 60-1.35(c)

## Background Checks

This policy establishes guidelines and provisions for individuals who have received an offer of employment contingent upon completion of a background check with the results satisfactory to Maximus. Maximus conducts background checks as part of its compliance and security efforts in accordance with applicable employment requirements. Offers of employment and/or continued

employment with Maximus will be contingent upon the satisfactory completion of a background check, permitted by controlling law. The use of background checks in no way changes an employee's at- will employment status.

This policy applies to all U.S.-based Maximus employees and contingent workers affiliated with all business units. This also applies to individuals performing work for Maximus in a temporary or contractor assignment capacity.

Successful completion of the background check process, whether conducted pre-employment or during employment, is not a guarantee or promise of continued employment. Individuals offered a position with Maximus must have a background check in process prior to their first day of employment. Where permitted by applicable law, more stringent client contractual requirements shall supersede these requirements.

Individuals offered a position with Maximus are permitted to start work upon completion of the MedScan (OIS/GSA Excluded Parties List scan) portion of the background check. The remaining components must be complete, including full adjudication of any findings, within two weeks of the candidate's start date. Candidates for whom a full background check is in the process will be permitted to start work but will remain in a status of "Conditional Hire."

The Background Check team will monitor these records using our third-party vendor's system, to ensure the results are reviewed once available, and handled accordingly. Candidates who have a red flag on any component of their background check will not be advanced to any hired status until after fully adjudicated.

In Massachusetts, Maximus conducts CORI compliant background checks on all persons applying for employment, reemployment, persons who join Maximus in the state of Massachusetts through acquisitions of other organizations or projects, or persons who join Maximus as contractors, subcontractors, vendors, volunteers, and interns performing work for the organization, herein referred to as "applicants," as authorized by the Department of Criminal Justice Information Service ("DCJIS")

Applicants and employees will be provided with a copy of DCJIS information regarding the process of correcting CORI and a copy of DCJIS Information Concerning the Process for Correcting a Criminal Record in accordance with DCJIS regulations 803 CMR 2.18.

Please contact Human Resources with any questions regarding this policy.

## Drug Testing

Maximus reserves the right to conduct drug and/or alcohol testing of applicants and/or current employees under the following circumstances, and as permitted by applicable law:

- For contracts which require pre-employment testing of applicants: Upon receiving a conditional offer of employment on a contract that includes drug testing provisions, all applicants (including those previously employed by Maximus) will be required to undergo drug testing. The drug test result must be negative as a condition of employment, unless the positive result is for drugs legally prescribed to the applicant or current employee for which documentation confirming the prescription may be requested. Applicants will be specifically notified if they are required to take a pre-employment drug test.
- Continuing employment testing of employees
- Reasonable suspicion/for cause testing of employees
- Post-accident testing of employees for suspicion of use
- Post-rehabilitation testing of employees
- Random or periodic scheduled testing of employees

Refusal to submit to a drug or alcohol test will be considered insubordination and will result in termination. For additional information, please see local your human resources representative.

## Employee Types

Maximus has several employee groups referenced throughout this Employee Handbook which may include different references or points of contact based upon job function and benefit group. This includes Fair Labor Standards Act (FLSA) status, Service Contract Act (SCA) and non-SCA employees, and limited service, along with part- or full-time employment. Please contact your supervisor or Human Resources if you have questions regarding your group or classification.

Below is an overview of the employee types:
- **Exempt employees** meet the duties test and minimum salary threshold to be classified as an executive, administrative, or professional employee under the FLSA. They are exempt from overtime compensation under both federal and state laws. Exempt employees do not receive overtime pay but are ordinarily compensated on the basis of a salary for each biweekly pay period.
- **Non-exempt employees** perform work that does not meet the criteria stipulated in the FLSA, which would exempt them from the protection afforded by the act. Non-exempt employees qualify for overtime based on hours worked and must be paid for all hours worked.
- **Regular full-time employees** typically work a regularly scheduled workweek consisting of a minimum 40 hours per week, for an indefinite period. Individual supervisors may assign or approve a different work schedule as operational needs require or permit.
- **Regular part-time employees** are compensated at a pre-determined hourly rate for hours actually worked and receive overtime for hours worked in excess of 40 in a work week.
- **Limited service and seasonal employees** are generally hired to fill a specific need or perform a specific task for a limited period, to be determined as needed. Limited service and seasonal employees may be classified as either exempt or non-exempt and may be full-time or part-time.

- **SCA employees** are covered by the Service Contract Act (SCA) requirements.
- **Non-SCA employees** are not covered by the SCA requirements.

## Employment Verifications

Maximus uses The Work Number for automated employment and income verifications for both Commercial and Social Services via telephone or online.

| Verification Type | Access Options | Information Required |
|---|---|---|
| **Commercial** <br> Mortgage loan, auto finance, credit card, job offer, apartment leases, etc. | theworknumber.com <br> 800.367.5690 | **Employer Name or Code** <br> Maximus, Inc. <br> Employer Code is 11033 |
| **Social Services** <br> Medicaid, SNAP, TANF, subsidized housing, etc. (only available to qualifying assistance agencies) | theworknumber.com <br> 800.660.3399 | **Employee's Social Security Number** |

## Former Employees

Maximus welcomes back any employee who left the Company in good standing. All requests to rehire a former employee will be reviewed via the process established by that specific project, and at a minimum the applicant must meet all posted job requirements. Please contact your local human resources representative if you have questions.

## Hiring Relatives

Maximus permits employment of relatives of employees provided there is no direct reporting relationship between the two positions. Employees should notify their supervisor or human resources representative of a potential or actual conflict of interest with relation to a reporting relationship. A family member or close personal relationship is described as:

- Spouse, fiancé, or domestic partner
- Parent (Biological, adopted, or stepparent)
- Child, stepchild, or grandchild
- Sibling or step sibling
- Grandparent (Biological, adopted, or stepparent)
- Aunt or uncle
- In-law
- Roommate
- Best Friend

## Job Postings

Existing, qualified Maximus staff will be given consideration when filling job openings provided they have the necessary skills and experience. Although this practice is intended to offer promotional opportunities to qualified employees within the department and to use the skills and knowledge gained by such individuals through their service to the department, employees may apply for positions outside their typical work area.

Open positions, up to and including the director level, will be posted internally for Maximus employees for a minimum of five business days unless, it is deemed in the best interests of the Company to waive the internal posting such as cases where the position is expected to be filled with a temp-to-hire candidate; or, in cases involving department reorganizations. Vice-president level and above positions may be posted at the discretion of the hiring manager.

External recruitment initiatives may be undertaken concurrent with the internal posting.

Maximus employees who have completed at least six months in their current position are eligible to apply for a posted position, and any exceptions to the six-month minimum are handled on a case-by-case basis by that specific project.

## Local Employment Requirements

Maximus adheres to all local, county and state employment requirements. For additional specific information, please visit your state's Department of Labor website or ask your local human resources representative.

## Outside Employment

Employees may obtain outside employment if it does not create a conflict of interest, compete with Maximus, Inc., its affiliates or subsidiaries (collectively "Maximus"), or otherwise interfere with the employee's job responsibilities, including scheduling requirements which may include overtime. Employees are prohibited from performing any services for customers of Maximus that are normally performed by Maximus.

If an employee obtains outside employment while working for Maximus, prior to beginning such employment, the employee's local human resources representative must be notified in writing. Please contact Corporate Ethics and Compliance via email at CorporateEthicsCompliance@maximus.com with any questions regarding this policy.

## Personnel Files

Maximus maintains a personnel file for each employee containing documentation regarding an employee's tenure with the Company. Personnel files are maintained by Human Resources. Employees who wish to view their file should contact their local human resources representative. Employees will be provided access to their file as required by applicable law.

# Time Charging and Payroll

## Attendance and Punctuality

To maintain a safe and productive work environment, Maximus expects employees to be reliable and punctual in reporting for scheduled work. Absenteeism and tardiness place a burden on other employees and on Maximus. Projects may have specific attendance and punctuality requirements, please see your supervisor or human resources representative for additional information on local requirements. Maximus attendance and punctuality requirements will comply with the requirements of all relevant and applicable federal, state, and local laws, and will not impact the general guidelines provided by respective policies that cover benefits, payroll, timesheets, leave programs, paid time off accruals, paid sick leave accruals, or any other available fringe benefit.

## Exempt Employee Compensation

If you are classified as an exempt salaried employee, you will receive a salary which is intended to compensate you for all hours that you may work for Maximus. You will receive your full salary for any workweek in which work is performed. However, under federal law, your wages for a pay period are subject to certain deductions and, absent contrary state law requirements, can be affected for certain reasons in a workweek in which work was performed, such as:

- Full day absences for personal reasons, for which you do not use paid time off
- Full day absences for sickness or disability, since we have a sick day pay plan and short-term disability insurance plan
- Full day disciplinary suspensions for infractions of safety rules of major significance (including those that could cause serious harm to others)
- To offset amounts received as payment for jury and witness fees or military pay
- Unpaid disciplinary suspensions of one or more full days for significant infractions of major workplace conduct rules set forth in written policies
- The first or last week of employment in the event you work less than a full week

In any workweek in which you performed any work, your salary will not be reduced for any of the following reasons:

- Partial day absences for personal reasons, sickness or disability
- Your absence because the facility is closed on a scheduled workday
- Absences for jury duty, attendance as a witness, or military leave in any week in which you have performed any work
- Any other deductions prohibited by state or federal law

**Please note:** You will be required to use accrued vacation or other forms of paid time off for full or partial

---

day absences for personal reasons, sickness or disability. However, your salary will not be reduced for partial day absences if you do not have accrued paid time off.

If you have questions about deductions from your pay, please contact your supervisor or manager immediately. If you believe your wages have been subject to any improper deductions or your pay does not accurately reflect all hours worked, you should report your concerns to your supervisor or manager who will contact the Payroll department. If your supervisor or manager is unavailable or if you believe it would be inappropriate to contact that person (or if you have not received a prompt and fully acceptable reply within three business days), you should immediately contact Human Resources.

Every report will be fully investigated, and corrective action will be taken, up to and including discharge of any employee(s) who violates this policy.

## Review Your Pay Stub

We make every effort to ensure our employees are paid correctly. Occasionally, however, mistakes can happen. When mistakes do happen and are called to our attention, we will promptly make necessary corrections. Please review your pay stub when you receive it to make sure it is correct.

## Meal Periods

Meal periods are scheduled to accommodate operating requirements. During meal periods, employees are not required to complete work-related tasks. Meal periods are unpaid time and not considered hours worked.

## On-Call Pay

On-call time is not compensable if the employee can effectively use the on-call time for personal pursuits. However, if the employee is "engaged to wait" and cannot spend time on ordinary activities of personal life, then Maximus pays the employee for the time in accordance with the Fair Labor Standards Act. On-call pay should be recorded on the timesheet as hours worked.

## Overtime

Non-exempt employees receive overtime pay based upon actual hours worked in excess of 40 hours per week or in compliance with state regulations. Employees classified as Exempt under the Fair Labor Standards Act (FLSA) standards are not eligible for overtime pay. Non-exempt employees must obtain approval from their supervisor prior to working overtime.

For purposes of calculating overtime, Maximus does not consider paid leave (i.e., paid time off (PTO), holiday, bereavement, jury duty, witness duty) or unpaid leave as hours worked. For purposes of calculating overtime for non-exempt employees, the workweek begins at 12:00 a.m. Sunday and ends at 11:59 p.m. Saturday.

Non-exempt employees receive overtime in accordance with federal and state wage and hour restrictions. The FLSA requires that covered employees, unless otherwise exempt, receive not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek. Special provisions apply to accommodate state and local wage and hour restrictions.

Non-exempt employees who work on a recognized holiday receive regular pay for the holiday, plus wages, at the employee's straight time rate for hours worked on the holiday. Overtime is paid as applicable in accordance with any local, county, and state employment requirements.

## Timekeeping

Maximus is committed to meeting all the Company's obligations as a responsible government contractor. Accurate reporting of labor is a critical component in meeting these obligations. All employees must remain familiar and comply with the Maximus time charging procedures.

Timesheets are the Company's official record of the work, and often form the basis of, what we charge our customers for our services. They provide a basis for an employee's pay and the account code to which labor costs are charged. They are subject to audit.

All employees are responsible for:

- Remaining aware of the activities they are performing and charging the appropriate charge code
- Accurately recording all hours worked (to the nearest tenth of an hour) daily (no later than 10:00 a.m. the following day)
- Certifying that the information included in the timesheet is complete and accurate at the end of each timesheet cycle
- Submitting a completed timesheet on the last working day of each timesheet period

Employees who do not complete their entire timesheet at the end of the pay period may be subject to disciplinary action. Employees should contact their timesheet approvers with any questions about their timesheets. Employees should contact their supervisor, or human resources representative with questions regarding timekeeping.

Tampering, altering or falsifying time records, or recording time on another employee's time record, is not permitted and can result in disciplinary action up to and including termination. When you receive your paycheck, please verify immediately that you were paid correctly for all regular and overtime hours worked each workweek.

## Workweek and Pay Period

The Maximus workweek starts on Sundays at 12:00 a.m. and ends at 11:59 p.m. Saturday nights. The pay period consists of two work weeks, and employees are paid on a biweekly basis. The Payroll calendars are available on My Maximus and from Human Resources.

# Ethics and Compliance

## Americans with Disabilities Act and VEVRAA

Maximus is committed to complying with all applicable provisions of the Americans with Disabilities Act ("ADA"), the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), and state and local laws. Maximus does not discriminate in employment against protected veterans and takes affirmative action to recruit, hire, promote, and retain these individuals. Maximus will provide **reasonable accommodations** to otherwise qualified applicants and employees with known disabilities to enable the individual to perform the essential functions of their job, unless an undue hardship on the Company would result.

Employees with a disability who believe they need a reasonable accommodation to perform the essential functions of their job should contact the Maximus Accommodations and Leave Team (MALT), more information is available here. Employees may be required to submit to a medical exam or provide documentation, including from the employee's physician or other medical or rehabilitation professional, substantiating the reasons for the requested accommodation and the nature of the accommodation sought. Employee's full cooperation and input in this process are expected. Individuals with disabilities are encouraged to request a reasonable accommodation.

## Conflicts of Interest

A conflict of interest in the workplace is a situation that benefits an employee but also affects the company. This may occur when an employee's interests lead them to actions, activities, or relationships that may undermine, negatively influence or place the company at a disadvantage. Conflicts of interest at work may include, but are not limited to: failing to disclose you are related to a current employee or a job candidate under consideration for hire by Maximus, dating or having a romantic relationship with a supervisor or subordinate, or reporting to a supervisor who is a family member, misusing company assets for personal benefit, conducting work for a competitor, obtaining outside employment on a part-time basis that may conflict with your current role, offering employment to current or former government officials, close associates or relatives of government officials in order to gain favor or unfair competitive advantage. Any conflict that results as a change due to a remote working assignment should be reported to your local human resources office or management. Refer to the Maximus Standards for Business Conduct and Ethics for additional information.

## Employee Disclosures

Everyone at Maximus – employees, directors, officers, consultants, and agency employees – must follow professional and ethical standards of conduct and avoid conflicts of interest between work and personal affairs when possible. All Maximus employees are required to complete an Employee Disclosure Form within 30 days of their hire date or as part of the annual refresher training.

All conflicts identified outside of those timeframes must be reported to your supervisor or local human resources office and completed within 30 days of the identified conflict. Any conflict that results as a

change due to a remote working assignment should be reported to your local human resources office or management. Failure to report an identified conflict could result in discipline, including ending employment and legal action. To learn more contact Corporate Ethics and Compliance via email at CorporateEthicsCompliance@Maximus.com.

## Complaint Procedure

Employees who believe they have experienced harassment or discrimination are encouraged, but not required, to respond to the individual directly. If the employee is not comfortable responding directly to the offender, or has a concern related to potential violations of the discrimination and harassment policy, the incident should be reported verbally or in writing to the employee's supervisor, to a human resources representative or to the Maximus Ethics Hotline at 1.844.592.2218 or online here.

All reported concerns will be investigated in a timely manner. Confidentiality will be maintained to the highest degree possible. Reporters will receive notification of investigation assignment and completion. Appropriate follow up action will be implemented based upon investigation findings. Individuals in supervisory roles are required to report any complaint of harassment they receive, in addition to any harassment they observe or become aware of.

### No Retaliation Statement

Maximus does not tolerate retaliation against an employee who has reported sexual or other harassment or discrimination. This no-retaliation policy applies to all reports made in good faith, participants in investigations and violators of this policy will be subject to disciplinary action, up to and including termination of employment.

## Ethics and Compliance Training, Whistleblowing and Ethics Hotline

### New Hires

It is expected that all Maximus employees will complete all required Maximus Ethics and Compliance Training program courses within their first 5 days of hire, but no more than 30 days, to affirm their understanding of the Company's Standards of Business Conduct and Ethics

### Annual Refresher

All Maximus employees are required to complete an annual compliance refresher to recertify their understanding during a 30-day event, initiated by the Corporate Compliance Officer.

Upon completion of training, there is an electronic certification affirming they understand the Company's Standards of Business Conduct and Ethics.

Occasionally, employees may be required to complete training during intervals outside of the new hire and annual refresher periods. Non-compliance with these requirements will be subject to disciplinary action, up to and including termination of employment.

Refer to the Maximus Standards for Business Conduct and Ethics for additional information, including how to report an ethical violation.

## Gifts & Entertainment

The Maximus Gift and Entertainment Policy provides guidelines for business-related gifts and entertainment given or received by Maximus employees and sets forth the limits and standards to be applied throughout the organization. Please review the full policy here.

## Harassment and Discrimination

Maximus has zero tolerance for harassment or discrimination of any kind and is committed to providing a work environment in which all employees are treated with decency and respect.

Harassment is unwelcome conduct. Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile or abusive. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying or participating in any way in an investigation, proceeding or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws.

To be unlawful, the conduct must create a work environment that would be intimidating, hostile or offensive to reasonable people.

Offensive conduct may involve verbal, physical or written conduct, including, but not limited to, offensive jokes, slurs, epithets or name-calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance. Harassment can occur in a variety of circumstances, including, but not limited to, the following:

- The harasser can be the victim's supervisor, a supervisor in another area, an agent of the employer, a coworker, or a non-employee
- The victim does not have to be the person harassed but can be anyone affected by the offensive conduct
- Unlawful harassment may occur without economic injury to, or discharge of, the victim

Accordingly, Maximus prohibits any harassment or discrimination based on a protected class, including but not limited to: race, creed, color, national or ethnic origin, gender, gender identity, gender expression, age, religion, sexual orientation, marital status, pregnancy status, citizenship status, disability, military status, U.S. veteran status, genetic information, or any status protected by law; this list is not exhaustive.

All Maximus employees are prohibited from engaging in sexual or other harassment or discrimination in the workplace. Sexual harassment may take many forms, including unwelcome sexual advances, requests for sexual favors, and verbal, written, visual or physical conduct of a sexual nature.

Maximus adheres to all local, county and state employment requirements (including as related to sexual harassment). For additional specific information, please visit your state's Department of Labor Website or your local human resources representative.

The Company specifically prohibits all Maximus employees and supervisors from taking adverse action against anyone in retaliation for reporting a good faith claim of harassment or discrimination.

## Information Requests

It is Maximus policy to cooperate with governmental authorities in conducting investigations or gathering information relating to potential violations of law. Any employee who receives a request for information, subpoena, or other legal document which requires that the employee act on behalf of or otherwise represent Maximus or another Maximus employee should escalate the request to the Human Resources Support Center (HRSC) immediately. The HRSC can notify a representative of Maximus' legal department if they requires guidance on how best to respond to the inquiry.

Employees must retain and preserve documents, electronically stored information, and other documents or evidence that are the subject of an investigation or request. HRSC will help employees review information and respond to governmental authorities. Please note that this policy does not apply to routine government audits, compliance reviews, or personal legal matters.

## Insider Trading

The Insider Trading Policy establishes guidelines for defining and enforcing laws and rules against Insider Trading, assure compliance with the laws as well as to avoid even the appearance of improper conduct by anyone associated with Maximus. Please review the full policy here.

## No Solicitation Policy

Solicitation on the Company's property causes associates to neglect their own work and interferes with the work of fellow associates. The following rules shall apply regarding solicitation or distribution:

1. There shall be no solicitation during working time
2. There shall be no distribution of literature, or any other goods, during working time or any other time in any working area

"Working time" means time designated for performing actual job duties, either by the person soliciting or distributing the literature or the person being solicited or receiving the literature.

Examples of "solicitation" include, but are not limited to: Inviting or encouraging participation, support or membership in any religious, political or other cause or organizations; requesting gifts, money, pledges or subscriptions; selling merchandise, products, services, tickets or raffles; conducting activities relating to a for-profit job outside of the scope of responsibilities for Maximus including but not limited

to candles, clothing, cosmetics, kitchen items, skin care products, food items, supplements and vitamins; or distributing non-Maximus materials such as merchandise products, leaflets, pamphlets, newspapers, petitions, pictures, pins, buttons or flyers.

Persons not employed by the Company are forbidden from coming onto the Company's property to solicit or distribute material for any reason regardless of whether property is owned or leased.

## Privacy

Maximus is committed to protecting Personal Information (PI). PI includes Protected Health Information (PHI) and Personally Identifiable Information (PII). It is critical to the successful operations of the Company's business that all employees handle PI with the proper degree of sensitivity and protection. Maximus has two privacy policies that employees must review and follow:

- The Statement of Privacy Practices provides important guidelines that all Maximus employees must follow when handling any PHI or PII. This policy sets forth the Company's minimum privacy requirements.
- The Privacy and Security Sanctions Policy describes the sanctions (penalties and corrective actions) for employees who do not keep confidential information or PI confidential, and emphasizes the importance of promptly reporting actual and potential privacy and security violations.

## Transgender and Gender Non-Conforming Inclusion Policy

This policy is designed to create a safe and productive workplace environment for all employees.

### Official Records

Maximus will change an employee's official record to reflect a change in name or gender upon request from the employee. Certain types of records (payroll, medical and retirement accounts), may require a legal name change before the person's name can be changed. Some records, however, can be changed to reflect a person's preferred name without proof of a legal name change. An employee has the right to be addressed by the name and pronoun that correspond to the employee's gender identity/expression, upon request, and to present to coworkers, clients and customers in a manner consistent with the gender with which the employee most identifies. A court-ordered name or gender change is not required.

### Restroom Accessibility

Employees shall have access to the restroom corresponding to their consistent gender expression. That is, transgender women must be permitted to use the women's restroom, and transgender men must be permitted to use the men's restroom. That decision should be left to the transgender employee to determine the most appropriate option for them.

# Facility and Emergency Preparedness

## Badges and Visitors

All individuals granted access to a Maximus facility must wear a valid ID badge and use their own badge to gain access, no piggybacking is allowed. If an ID badge is lost or stolen, the individual must promptly report the missing badge to the appropriate project team member.

For the safety and security of our employees and facilities, Maximus allows only authorized visitors in the workplace. Restricting unauthorized visitors helps maintain safety standards, protects against theft, ensures security of equipment, protects confidential information, safeguards employee welfare, and avoids potential distractions and disturbances.

All visitors must enter Maximus premises at the reception area and be assigned a visitor badge to be displayed while on Maximus premises. Authorized visitors receive directions or an escort to their destination. Employees are responsible for the conduct and safety of their visitors.

If an unauthorized individual is observed on Maximus premises, please notify a supervisor, security, or a facility manager immediately or, if necessary, escort the individual to the reception area.

## Dress for Success

Maximus values its professional image and culture. Please see your supervisor or local human resources representative for specific information regarding your site.

Reasonable accommodations will be made for dress related to an employee's religious beliefs or disabilities, provided that the accommodation does not create an undue hardship for the Company. In business casual work areas, specific attire or fashion that is unacceptable at all times includes, but is not necessarily limited to, the following: hats or head coverings (unless an accommodation or deviation is granted).

## Drug and Alcohol-Free Workplace

Maximus endeavors to provide a safe and productive work environment free from drugs, controlled substances and alcohol for all associates. Maximus employees are prohibited from manufacturing, distributing, dispensing, possessing, or using a controlled substance, illegal drugs (including marijuana) and alcohol in the workplace. Limited use of alcohol is permitted at approved social-business functions. Additionally, employees are prohibited from reporting for work or performing work under the influence of a controlled substance, illegal drugs (including marijuana) or alcohol.

### Early Recognition Program

Maximus has instituted an early recognition program for those who admit to chemical or alcohol dependency problems and agree to treatment in a drug or alcohol rehabilitation program. The Human

Resources department will aid in locating treatment centers that will coordinate with our current medical insurance plans.

These arrangements will be kept confidential, and a proper leave of absence will be allowed where necessary.

Associates who voluntarily seek help acknowledging the problem and agree to complete treatment as approved by Maximus may continue employment. The associate may be subject to return-to-work

Screenings in accordance with applicable law. Positive test results will result in immediate termination of employment.

## Severe Weather or Emergency Conditions

Maximus offices follow the direction of the federal government (Office of Personnel Management) for closing decisions due to inclement weather or any other local or national emergency. If an early closure may be required after the office is open, executive management determines whether the office will close and at what time.

Emergency closings for all other offices are based upon guidance provided by the client and Maximus management.

Time off due to emergency closures may be required to be recorded as accrued but unused Personal Time off (PTO), unpaid time if the employee does not have PTO, where permitted by state law or another time code. Time for exempt and non-exempt employees will be recorded in the timekeeping system, as directed.

## Use of Tobacco Products

Maximus is committed to providing a work environment that promotes the health, hygiene and wellbeing of its employees. Therefore, smoking, vaping and chewing tobacco are prohibited inside all Company facilities and vehicles. This applies to all Maximus employees and visitors while on the Company's premises. Employees are expected to exercise common courtesy and to respect the needs and sensitivities of coworkers. Smoking is only allowed during scheduled breaks and in designated areas.

## Workplace Safety and Security

Maximus endeavors to provide a safe work environment for all employees in order to minimize the risk of work-related injuries. This shall be achieved through the application of proper safeguards to processes, equipment, methods and procedures and by providing employees with the training necessary to perform their job safely. This also includes reporting unsafe conditions and acting promptly when unsafe conditions are reported. All offices must have an emergency preparedness plan guide readily available to employees. The Maximus emergency preparedness guide template must be used and is located on My Maximus, under Resources, then under Emergency Plans.

## Facility Access when not on Duty

Non-exempt employees are prohibited from accessing the interior of a Maximus facility or remaining inside a Maximus facility when they are not on duty. This rule applies regardless of the reason an off-duty employee may wish to gain access to, or remain inside, a Maximus facility. This rule does not limit off-duty employees from accessing the exterior portions of a Maximus facility, such as the parking lot.

## Violence in the Workplace

Maximus has zero tolerance for acts or threats of violence in the workplace, this includes no weapons in the workplace. Any employee who engages in any violence in the workplace, or threatens violence, will be subject to disciplinary action, up to and including termination. discharged. Any talk of violence or joking about violence will not be tolerated.

## Lactation/Breastfeeding Breaks Policy

As part of our family-friendly policies and benefits, Maximus supports breastfeeding mothers by accommodating the mother who wishes to express breast milk during their workday when separated from their newborn child.

## Accommodation for Lactating Mothers

For up to one year after the child's birth, any employee who is breastfeeding their child will be provided reasonable break times to express breast milk for their baby. Maximus has designated an onsite location for this purpose. A small refrigerator reserved for the specific storage of breast milk is available. Any breast milk stored in the refrigerator must be labeled with the name of the employee and the date of expressing the breast milk. Any nonconforming products stored in the refrigerator may be disposed of. Employees storing milk in the refrigerator assume all responsibility for the safety of the milk and the risk of harm for any reason, including improper storage, refrigeration and tampering. Nursing mothers wishing to use this room must request/reserve the room by contacting their local Human Resources representative. Additional rules for use of the room and refrigerator storage are posted in the room. Employees who work offsite or in other locations will be accommodated with a private area as necessary.

Breaks of more than 20 minutes in length will be unpaid, and the employee should indicate this break period on their time record.

# CORE Benefits Program

## Accommodations and Leave

(Please view the Maximus CORE Benefits Program for the full benefits policies here)

Maximus has various leave types available for eligible employees. These include:

- The Family and Medical Leave Act (FMLA): The Family Medical Leave Act is a federal law that allows eligible employees to take up to 12 weeks of job protected, unpaid leave for a qualifying reason.
- State Leave: Additional leave under various state laws may be available to eligible employees in some states.
- Leave as a Work Accommodation (LWA): Allows employees to go on leave as a result of their own serious health condition. LWA does not offer job protections and must be pre-approved. If the LWA is part of an Americans with Disabilities Act (ADA) reasonable accommodation, then it may be job protected. If you need a reasonable accommodation besides leave, please click here to review additional information.
- Personal Leave of Absence (PLOA): Allows employees to apply for leave for personal reasons that do not include the employee's own medical related leave, FMLA eligible leave, and additional leave after FMLA is exhausted, military leave, or state leave. PLOA does not offer job protections and requires pre-approval.

For further information regarding Leave of Absence, please see:

- leaverequests.Maximus.com
- mybenefits.Maximus.com
- Maximus CORE Benefits Program

## Education and Training

Maximus promotes employee development through external courses, symposiums, professional organizations and by the establishment of the Center for Employee Development (CED). Corporate training, provided by the CED, is administered through the Company's online enterprise Learning Management System and classroom training sessions. Supervisor approval is required for most corporate training offerings. Employees can view course offerings, resources, news, knowledge articles, webinars, and more by accessing MAX U here.

## Executive Time off (ETO)

Maximus understands that the demands of an executive-level position (vice president and above) often require flexibility in schedule. Executives are required to work an undefined amount of hours to satisfy job requirements. Therefore, there is no limit placed on the amount of time off work with pay an executive can take. Executives are responsible for managing their own schedule and maintaining an appropriate work-life balance while meeting performance standards.

## Group Health Insurance, Wellness and 401(k) Benefits

As an advocate of health and wellness, Maximus provides eligible employees with a comprehensive program of benefits, including medical, dental, vision, wellness, life insurance, short-term disability, long-term disability, 401(k), EAP and other voluntary benefits. If you have any questions, please contact Benefits at benefits@Maximus.com.

Employees can access the HR Benefits Portal to review specific group health insurance, short-term disability, long-term disability, wellness and 401(k) benefits information. SCA employees with GSA National benefits can access their benefits information at gsanational.com or by calling 1.800.250.2741. Maximus reserves the right, in the Company's sole discretion, to: Change the level of the company's benefits or contribution for insurance coverage, the scope of coverage and benefits provided under each type of benefit or insurance, and/or the types of benefits and insurance carriers provided; Change the level of non- insurance benefits; and/or Eliminate any benefit or type of insurance coverage currently provided.

## MaxClub now MAXCore Program Policy

The MAXCore Program (formerly MAXClub) provides an avenue for social interaction among staff utilizing specifically allocated Maximus funds for social activities designed to promote and maintain employee engagement and morale. Please see the MaxClub now MAXCore Program Policy (hyperlink to Core Benefits) for additional information.

## MAXDollars

MAXDollars are funds available for disbursement to eligible employees whose performance merits special recognition. When approved, MAXDollars are presented to the employee to express the Company's appreciation and to positively reinforce the outstanding accomplishment.

## Paid Holidays

Eligible employees receive paid holidays. Please note that based upon project business need, your holiday schedule may vary slightly. Please see the Payroll calendars posted on My Maximus or ask your supervisor or local human resources representative for additional information. Please go to the CORE Benefits Portal to review the specific policies for your employee group here.

## Paid Time Off

Maximus provides Paid Time off (PTO) to eligible employees for vacation, personal time, personal illness or injury, medical/dental evaluation or treatment, local travel to and from sources of care, or to care for a family member. Non-SCA, part-time employees with work schedules less than 30 hours per week are not eligible for PTO accrual. The amount of PTO accrued is based upon length of service for non-SCA employees, while SCA employees receive PTO based upon their specific contractual requirements.

While we strive to meet the PTO requests of our employees, Maximus may limit the use of PTO used during any period to assure we meet client performance expectations. Additionally, Maximus may schedule mandatory PTO from time to time for various reasons such as holiday closures and furloughs to assure PTO balances are used.

All employees should schedule time off with their supervisor in advance as soon as practical through the Workday system or through the established leave request process specific to their project. Please visit the CORE Benefits Policy for the full PTO Policy here.

## Performance Management — Bonuses

These guidelines are for awarding exceptional employee performance with the Maximus bonus program.

At Maximus, a bonus is in addition to, not a part of, the regular salary. The bonus is not an entitlement. Rather, it is a reward for superior performance. It is strictly contingent upon previously determined financial goals. Employees in regular status may be eligible to participate in a bonus plan, (MAXDollars, Management or Project plans). The Chief Executive Officer (CEO) has sole discretion in determining bonus awards. With the exception of the CEO, no employee may commit the Company to payment of a bonus award. To be valid, all bonus plans must be in writing and approved by the CEO. Applicable to all Maximus employees affiliated with all business units, including majority-owned subsidiaries and joint ventures.

## Performance Management — Merit Based Pay Adjustments

All SCA employees are eligible for pay increases when an increase in the Wage Determination associated with the contract to which they are assigned occurs, or by the discretion of management.

All other employees in regular status are eligible for annual salary reviews. No increases are guaranteed, and salary adjustments are awarded based on merit and performance. Wage and salary increases are dependent upon a variety of factors, including: 1) the Company's ability to pay higher wages and salaries and 2) the performance level of the individual employees. Satisfactory performance evaluations are not a guarantee of an increase in wages, salary or benefits, and they are not a guarantee of advancement or of continued employment.

## Remote Worker Policy

As appropriate, Maximus may allow certain employees to work remotely from home. This policy applies to employees permitted to work from home on a regular basis. Employees who require a reasonable accommodation or occasional work from home arrangements should contact Human Resources. Please visit the CORE Benefits Policy for the full Remote Working Arrangements Policy by here.

## Referral Bonus

The intent of the Employee Referral Program is to encourage Maximus employees to refer qualified, external candidates for positions within Maximus. Maximus believes that current staff members are

the best source of qualified talent and wants to reward them for helping to achieve strategic growth objectives.

Referral bonuses will be paid to the referring employee (less applicable taxes) after the referred employee completes first 90 days of employment in accordance with the following schedule. The payment is not contingent upon the referring employee's active status. Additionally, referral bonuses will be paid only if the referred employee was not actively on Maximus payroll as a Maximus employee within the past 24 months.

- $3,000 referral reward will be paid for vice president level and above positions
- $2,500 referral reward will be paid for manager and director level positions
- $2,000 referral reward will be paid for other exempt level positions
- $200 referral reward will be paid for non-exempt positions (with the exception of hiring for select projects, amounts may vary).

Employees with the job title of vice president or above, human resources and recruiting staff, or those who have hiring authority or are in a temporary position are not eligible for payment under the Referral Bonus Program.

## Severance

Employees who qualify for severance pay include:
- Regular, full and part-time staff,
- Limited service staff who are hired into a role classified as limited-service and who have reached or exceeded 12 months of service in their limited-service role,
- Staff who are rehired into a limited-service role, where their total tenure has reached or exceeded 12 months of service in total,
- Limited service staff who transfer from a severance-eligible status into a new or different limited-service role, regardless of tenure in their limited service role.

Severance is typically provided in cases of involuntary termination when a position is eliminated or in cases of mutual agreement separation. Severance may also be provided in other cases of termination when the company desires to receive a release agreement from the departing employee. Generally, qualified employees will receive severance in accordance with the chart below, based on the employee's job band and tenure. Eligible part-time employees will receive a pro-rated severance pay based on average hours worked within the prior 12 months.

| Job Band/Grade | Calculated severance | Minimum severance |
| --- | --- | --- |
| 1-4 and SCA | Two (2) weeks for every year of completed service | Two (2) weeks |
| 5-7 | Two (2) weeks for every year of completed service | Four (4) weeks |
| 8-9 | Two (2) weeks for every year of completed service | Six (6) weeks |
| 10+ | Two (2) weeks for every year of completed service | Twelve (12) weeks |

If an employee is rehired by Maximus during the severance payment period, the employee will be required to repay the balance of the severance for the weeks remaining in the severance period.

To be eligible: employees must sign/return a separation agreement, have an executed Confidentiality Agreement (C&RC) or other Maximus equivalent version of this document. Maximus reserves the right to suspend or alter this benefit in situations that are deemed seriously prejudicial to the Company. Severance will not be provided in situations where the employee is offered comparable, continued employment by a successor vendor or in disciplinary discharge situations. Management may provide the employee additional compensation (e.g., cash equivalent of unvested Restricted Stock Units, early payment of annual bonus, retention bonus to allow time for transition activities, COBRA premiums, etc.). Approval of these additional payments is evidenced by the inclusion of the additional payments in the Separation Letter that is signed by the Chief of Human Resources or Chief Executive Officer.

## Sick Leave

Maximus provides sick leave to eligible employees as defined in the Non-SCA and SCA Sick Leave Policies. Eligibility is based upon position title, SCA contract requirements, ineligibility for PTO, employee status, part or full-time status, and state or local sick leave mandates. Please review the full Sick Leave policies here.

All employees should schedule time off with their supervisor in advance as soon as practical through the Workday system or through the established leave request process specific to their project.

## Workers Compensation

Maximus maintains workers compensation insurance as required by law. Employees injured on the job are to report the injury to their supervisor immediately (or as soon as possible) after the incident/ accident. Near-miss accidents or incidents (when an employee nearly has an accident but can avoid it) should be reported as well. This reporting requirement applies to all work-related injuries sustained by an employee on Company property or while conducting Company business offsite.

## Professional Development & Licensure Support

Maximus supports employees in the pursuit of professional development. Employees are encouraged to join professional and technical societies related to their position and specialization. Some expenses may be eligible for reimbursement with the approval of the employee's direct supervisor. Generally, these eligible expenses for reimbursement would include the annual dues for one membership and the professional society's primary journal for managers and above pursuing membership.

Maximus employees at the manager level and above may request to attend relevant professional meetings, symposia, or conferences, so long as attendance does not have an adverse impact on the completion of Maximus business responsibilities. If attendance to the professional meeting is approved, the employee will be permitted paid days to attend the meeting, symposia, or conference (up to three events per calendar year).

Maximus professional employees are strongly encouraged to gain and maintain professional licenses that may be applicable to their job with Maximus. Employees with professions or career paths that demand professional licensing or certification by third-party governing authorities should apply for expense reimbursement for licensing-related expenses.

## SCA Purchased Paid Time Off

This policy establishes the guidelines for Purchased Paid Time Off (PPT), including eligibility, application, accruals, pay reconciliation, and tax implications. This policy applies to all Service Contract Act (SCA) Employees working 20 or more hours per week and have at least one year of service at the start of the plan or calendar year for which they elected PPT.

Maximus provides PPT to allow eligible Employees the flexibility to receive what is most important to them. The PPT plan provides Employees the opportunity to buy additional paid leave with salary reductions for use during the upcoming plan or calendar year. The use of the term "Purchased Paid Time Off" in this policy is not meant to be synonymous with "Paid Time Off." PPT is a separate leave type and is treated as such.

Eligible Employees working 30 or more hours per week may purchase up to 40 hours (in 8-hour increments) of PPT. Additionally, eligible Employees working 20 hours per week may purchase up to 20 hours in (4-hour increments) of PPT. Mid-year changes to an Employee's scheduled weekly hours, like changing from a Full-Time status to a Part-Time status, or vice versa, will not affect the election.

Enrollment for PPT is available to eligible Employees during the following occasions:

- Our annual Open Enrollment period.
- For those Employees transferring into an SCA status between the end of our annual Open Enrollment period and the end of that calendar year, they will be able to elect PPT for the following year.
- For those Employees transferring into an SCA status between the beginning of a calendar year and the end of February, they will be able to elect PPT for that current year.

Employees who experienced a status change will have up to 30 days from the effective date to submit their PPT elections. PPT elections will carry forward to the next calendar year unless an employee actively changes their election during annual Open Enrollment.

Employees transferring out of an SCA status will no longer be eligible for PPT. Transferring Employees who have been paid for more PPT usage than the total of their deductions will be required to repay the excess PPT value, or a future pay will be adjusted to recover the excess payment, in accordance with applicable law. PPT deductions taken to date for any unused PPT will be paid out as soon as administratively possible.

Eligible Employees may request scheduled PPT at any time after PPT is available in their timesheet. PPT is for use within the same calendar year of purchase. Scheduled PPT should be taken at times compatible with the efficient conduct of Maximus business.

To request scheduled PPT, Employees should submit a request in writing to their supervisor at least 48 hours in advance. This notice requirement may vary by project.

Employees are not required to use Purchase Personal Time (PPT) prior to taking leave without pay, only other available paid leave. However, Employees must exhaust their other paid leave balances prior to taking any unpaid leave, where permitted by state law.

PPT hours must be taken in minimum increments of one tenth of an hour. Employees working a schedule other than eight hours a day, five days per week who record a full day of PPT, must do so at their regularly scheduled workday hours.

Employees may not have a negative PPT balance at any given time.

Unused PPT hours cannot be carried into the next year. Unused PPT hours will be paid out in the following plan year and as soon as administratively possible. PPT cannot be charged retroactively to the previous year and PPT usage cannot be changed after the year is complete.

PPT deductions are initially calculated based on an employee's rate of pay as of January 1. If a salary change occurs throughout the year, the deduction amount will not be changed. Because PPT deductions are taken on an after-tax basis, the dollars received are not taxed when PPT time is used. However, if an employee receives an increase in pay during the plan year and has not used all their PPT, when the remaining PPT is used, the difference between the pay rate at election and the new rate will be taxable income. PPT is not considered eligible compensation for 401(k) purposes. Shift premium, bilingual, and location pay do not apply to PPT.

After the end of the year, if the value of PPT paid for usage exceeds the deductions taken during the year, Maximus will withhold from an employee's wages the total amount of the difference. Additionally, if the value of PPT deductions taken exceeds the amount paid for usage, this amount will be refunded after the end of the year. These additional deductions and refunds will be made as soon as administratively possible once the year has ended.

Employees who terminate who have been paid for more PPT usage than the total of their deductions will be required to repay the excess PPT value, or the final pay will be adjusted to recover the excess payment, in accordance with applicable law. PPT deductions taken to date for any unused PPT will be paid out as soon as administratively possible.

## Veteran Compensation and Pension Leave

This policy establishes the guidelines and provisions for veteran employees who are required to complete the Compensation and Pension Examinations (C&P Exams) by the Veterans Affair (VA) office to examine a veteran's conditions or disabilities. Veterans who have been requested by the VA to complete the C&P yearly examinations will be eligible to receive up to 20 hours of Veteran Compensation and Pension Leave per calendar year.

This policy applies to all regular full-time and part-time veteran U.S.-based Maximus employees affiliated with all business units. Eligible employee(s) must contact their immediate supervisor with a written or oral notice that the employee will be engaged in the C&P exams with the VA. Veteran employees will be required to submit documentation of scheduled appointments to Human Resources and their immediate supervisor.

All regular full-time and part-time veteran employees are eligible for the Compensation and Pension Leave if they are absent from work due to C&P examination. Independent contractors and employees who were only employed for a brief, non-recurrent (one-time only) period before the start of military service are not eligible for leave under this policy.

Please contact Human Resources with any questions regarding this policy.

# Technology and Use

## Use of Equipment

Maximus provides equipment that is essential for performing an employee's job duties. This equipment is often expensive and may be difficult to replace. Employees should exercise care, perform required maintenance, and follow all operating instructions, safety standards, and guidelines when using Company property.

Please notify either the building operations or information services personnel if any equipment, machines, or building fixtures appear to be damaged, defective, or in need of repair. Prompt reporting of damages, defects, and the need for repairs could prevent deterioration of equipment and possible injury to employees or others.

## Computer and Internet Usage

Maximus provides telephones, internet access, voicemail, electronic mail, and fax communications systems to assist employees in performing their jobs. All messages generated on or handled by Maximus electronic communications systems, including back-up copies, are the property of Maximus.

Electronic communications systems should be used primarily for business purposes.

Employees have no right or expectation of privacy in the use of any of the electronic systems owned by Maximus.

Users must promptly report all information security alerts, warnings, suspected vulnerabilities, and similar threats to the Maximus IT Service Desk (1.888.349.7762) or by email to ISO-IR@Maximus.com. The Maximus Information Security policies can be accessed via My Maximus under Policies & Procedures or directly below:

- Acceptable Use Policy
- Information Security Governance Set

## Use of Personal Cell Phones

Personal use of cellular telephones during work hours is discouraged. Cellular telephones for personal reasons can be used during breaks and lunch periods if they are used away from the normal work area. Additionally, cellular telephone use is restricted in some sites and production areas dependent on local requirements.

# Branding and Media

## Business Use of Social Media

Employees are prohibited from representing or speaking on behalf of Maximus in social media forums unless authorized by Corporate Communications and Investor Relations. Improper business use of social media can pose risks to Maximus confidential and proprietary information, its reputation and brand, and can jeopardize the Company's compliance with business rules, laws and SEC disclosure policies.

Employees seeking authorization for the use of social media for business purposes must provide an outline of the benefits and proposed use and operations of social media for the project/business purposes and present to Digital Solutions. Please see the Authority Matrix (section CM.6B and PE.5) for more information on the required approvals for business social media accounts.

## Logo Use and Brand Standards

The Maximus corporate logo consists of only the letters "Maximus" in a stylized font and is the color black, or white with our Maximus purple background. Older versions of the logo, including those with the cornice or the tagline Helping Government Serve the People® should not be used. Please see the Corporate Branding & Writing Standards for more information on the proper use of Company logos.

New logos for various products, programs or applications must be approved by Corporate Communications and Investor Relations. Please see the Authority Matrix (sections CM.5 and CM.7) for more information on the required approvals for the use or creation of logos and names. All Maximus logos that are authorized for current use can be found under the Marketing Resources page on MAXNet.

## Media

Only preauthorized spokespersons can speak to the media on behalf of Maximus. Employees who are contacted by the media to provide a comment on the Company's behalf must contact the Media team. Instances that require a more localized response should also be coordinated through the Media team to ensure that the message is consistent and the Company is in compliance with all appropriate disclosure policies. Please see the Authority Matrix (section CM.4) for more information on the required approvals for responses and interviews with the media.

## Personal Use of Social Media

Improper use of social media can pose risks to Maximus confidential and proprietary information. It can also harm our reputation and brand, and jeopardize Company compliance with business rules, laws and SEC disclosure policies. When posting on social media, it is important to:

- Maintain the confidentiality of the Company's confidential information and trade secrets, along with all client and employee Personally Identifiable Information (PII) and Protected Health Information (PHI). Do not post internal reports or other internal business-related confidential communications.

- Express only your personal opinions. Never represent yourself as a spokesperson on behalf of Maximus.
- Respect financial disclosure laws. It is illegal to communicate or give a "tip" on inside information to others so that they may buy or sell stocks or securities.

If you see any maliciously false social media content or content that is disparaging or defamatory to clients or competitors, please report it to your supervisor, your local human resources representative or the Ethics Hotline (1.844.592.2218 or online here).

For more information on how to protect yourself and your information on social media, please view the Maximus Social Media Guidelines.

## Press Releases

All press releases that meet one of three criteria: national release, wire distribution, or ticker symbol, and all local press releases without wire distribution issued on behalf of Maximus, must be approved by Corporate Communications and Investor Relations. This approval will ensure that the Company complies with all required legal disclosure obligations required by a public company, and all expressed contractual obligations with our clients regarding public disclosures and announcements. Please see the Authority Matrix (section CM.3) for more information on the required approvals for all press releases.

# TAB 7

# EXHIBIT B

**Case: 2930 - Hotline Web Health**
**Employee Relations : Other**

## Case Snapshot

**Opened:** 12/07/2022
**Days open:** 43
**Last modified:** 01/22/2024 9:18 PM
**Date closed:** 01/20/2023
**Intake method:** Hotline Web
**Status:** Closed
**Alert:** Green

## General Case Info

**Case number:**
2930
**Received/Reported date:**
12/07/2022
**Language:**
English
**Assigned tier:**
Health

**Issue**
**Primary issue:**
Employee Relations : Other

## Case Details Show Original Case Details

**Reported tier information**
**Case type:**
Allegation
**Intake method:**
Hotline Web

**Location**
**Organization/Building name:**
MAXIMUS, Inc.
**Branch number:**
CAR001
**Location name:**
HLTH WEST/CA HF
**Location/Address:**
US - CA - Remote - CAR001
Remote Location Address
**City:**
Remote
**State/province:**
CA
**ZIP/postal code:**
95814

**Country/Territory:**
USA

**Reporter Information**

**Is the reporter an employee?**
Yes

**Reporter anonymous:**
No

**Reporter first name:**
Audrea

**Reporter last name:**
Barnes

**Phone number:**
909-261-0505

**Email address:**
Audreacmp@gmail.com

**Contact availability:**
11:30am to 8:00pm Monday thru Friday Pacific Standard Time

**Case Information**

**Please identify the person(s) engaged in this behavior:**
████ ████ - Technician2

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
Prudence Duke, Manager may have been informed of ████ ████ unethical behavior, validation of this knowledge is unknown.
My direct report manager, Mai Vang, Sr. Business Analyst Manager was made aware of the unethical behavior via phone conversation and three (3) email communications.

**Is management aware of this problem?**
Yes

**What is the general nature of this matter?**
Initially, I called my manager, Mai Vang, on my cellphone and was very upset and in tears. I expressed to her ████ ████ unethical behavior and attempted to give her the details verbally, but she said she did want to hear it. I was saddened about her attitude and felt compelled to put in writing these offenses to make sure she read the details of my complaint, only because she told me she did not want to hear the details.
Incident No. 1 - Sept. 15, 2022, ████ ████ changed my Global Maximus password without my knowledge. I am unsure if he has the security clearance at Maximus to do so. This incident put me at risk of unknown activities/events that may have taken place under my Maximus Employee Operator's I.D. without my knowledge. I notified my manager, Mai Vang via email on 9/15/2022 at 10:34 p.m. because I could not log-in to the Deltek Timekeeping System to complete my timesheet for pay wages.
Incident No. 2 - ████ ████ made verbal, unethical, disparaging remarks, and flagrant lies about me that were untrue, hurtful, blatantly offensive, with an attempt to assassinate my character and to ruin my reputation here at Maximus.
Incident No. 3 On Nov. 3, 2022, I requested to take off work to exercise my civil rights to vote in person. Such privileges were granted by the State of California for employees to take off during work hours to vote and perform our civil rights and duties. I was challenged by manager, Mai Vang, why I could not vote according to her terms and conditions. All I wanted to do was exercise my civil rights to vote. I need to understand what is Maximus' policy on voting and management's behavior towards their subordinate employees as it relates to voting intimidation, management compelling their employee on how they should vote, employee's voting rights, and voting tactics of coercion as it also relates to Election Code section 18540 i.e., Election Day and Voting Violations.
Incident No. 4 - I want to know why my manager, Mai Vang, did not get back to me with regard to ████ ████ character assassination and defamation of character of me? I don't know what was the outcome of my complaint.
Inquiry: Do Maximus employees have to use their PTO to vote on their assigned shift and during business hours?

**Where did this incident or violation occur?**
My private emails, my personal cellphone conversations, during Maximus' Teams chat sessions, and Maximus' internal email System.

**Please provide the specific or approximate time this incident occurred:**
On Nov. 3, 2022 - Voting issue/coercion
On or about Sept. 15, 2022 ▮▮▮ ▮▮▮ changed my Maximus Global password without my knowledge.
On or about Sept. 16 - ▮▮▮ Proffit's Unethical and blatantly false allegations made against me.

**How long do you think this problem has been going on?**
Once

**How did you become aware of this violation?**
I heard it

**If other, how?**
Also, my manager, Mai Vang told me that ▮▮▮ ▮▮▮ changed my Maximus Global Password. He did this without my knowledge thus locking me out without access of all Maximus computer systems.

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
I am unsure if these problems were concealed. But the evidence is compelling and the investigative process will validate the chain of events whether they are unlawful tactics, violation of Maximus' corporate policies...and other discoveries that may be deemed inappropriate, civil rights violations and of willful and deliberate intent.

**Details:**
Initially, I called my manager, Mai Vang, on my cellphone and was very upset and in tears. I expressed to her ▮▮▮ ▮▮▮ unethical behavior and attempted to give her the details verbally, but she said she did want to hear it. I was saddened about her attitude and felt compelled to put in writing these offenses to make sure she read the details of my complaint, only because she told me she did not want to hear the details.
Incident No. 1 - Sept. 15, 2022, ▮▮▮ ▮▮▮ changed my Global Maximus password without my knowledge. I am unsure if he has the security clearance at Maximus to do so. This incident put me at risk of unknown activities/events that may have taken place under my Maximus Employee Operator's I.D. without my knowledge. I notified my manager, Mai Vang via email on 9/15/2022 at 10:34 p.m. because I could not log-in to the Deltek Timekeeping System to complete my timesheet for pay wages.
Incident No. 2 - ▮▮▮ ▮▮▮ made verbal, unethical, disparaging remarks, and flagrant lies about me that were untrue, hurtful, blatantly offensive, with an attempt to assassinate my character and to ruin my reputation here at Maximus.
Incident No. 3 On Nov. 3, 2022, I requested to take off work to exercise my civil rights to vote in person. Such privileges were granted by the State of California for employees to take off during work hours to vote and perform our civil rights and duties. I was challenged by manager, Mai Vang, why I could not vote according to her terms and conditions. All I wanted to do was exercise my civil rights to vote. I need to understand what is Maximus' policy on voting and management's behavior towards their subordinate employees as it relates to voting intimidation, management compelling their employee on how they should vote, employee's voting rights, and voting tactics of coercion as it also relates to Election Code section 18540 i.e., Election Day and Voting Violations.
Incident No. 4 - I want to know why my manager, Mai Vang, did not get back to me with regard to ▮▮▮ ▮▮▮ character assassination and defamation of character of me? I don't know what was the outcome of my complaints stated herein, but would like to know.

The problem is, if I apply for a job within the Maximus company, these disparaging remarks could "black ball" me, and I would be a victim of disenfranchisement because of character assassination made against me by ▮▮▮ ▮▮▮ I would not have an equal opportunity to compete equitably against my co-workers for a promotion. ▮▮▮ ▮▮▮ do not know me and to dispel hurtful rumors to either his manager or coworker is unethical and wrong in nature. Character reputation is everything in business, and these series of events can adversely impact my career growth and/or promoting within the company should I interview with the person ▮▮▮ "bad-mouth" me to. I will defend my reputation at great length, especially against false and malicious allegations by my co-workers.

Lastly, I want to know Maximus' policy and procedures in following up with the complainant after reporting unethical behavior from coworkers.

What is Maximus policy on voting intimidation and tactics of coercion

I have credible evidence and supporting documents supporting my claim which also includes: private emails, MSWord documents of screen shots of policies and procedures in the Maximus Team Channel. These documents must be reformatted into a word document and uploaded. Will do so within two (2) days of this complaint.

**Follow-ups**

**Reporter Additional Information**
There are no additional notes for this incident.

**Questions/Comments and Reporter Responses**

**12/08/2022 - Wheat, Julie**
**Comment:**  Thank you for contacting the Maximus Ethics Hotline. Your report has been assigned to Paula Hamilton, Lead Specialist Corporate Ethics and Compliance to investigate. If you would like to contact Paula, she can be reached at paulahamilton@maximus.com or 703.997.9238. Please check back for any follow up or additional questions from the Investigator.
We prohibit retribution or retaliation against anyone who reports suspected unethical behavior in good faith.

**01/20/2023 - Hamilton, Paula**
**Comment:**  The investigation of this matter has been completed, and appropriate action has been taken. Due to the confidential nature of any investigation, findings must remain confidential and cannot be shared. Thank you for filing your report.

## Assignments & Access

**Case assignee(s):** Hamilton, Paula (Primary)
**Restricted access:** None
**Case access list:** Adair, Adoria; Bailey, Julia; Bond, Luke; Clegg, Millicent; Dean, Karen; Esquivel, Arturo; Fender, Lauren; Frasca, Isabelle; Frias, Nicole; Hamilton, Paula; Johnson, Aliza; Knutson, Sheryl; Martinez, Cesar; Munn, Suzanne; Ohanian, Nathalie; Popova, Irena; Rai, Estelle; Snodgrass, Richard; Sorro, Brandy; Stefanos, Eritrea; Wheat, Julie
**Case Due Date:** 01/07/2023

# Info Contributors

None

## Participants

| Name | Job Title | Relationship | Issue | Role | Results | Notes |
|---|---|---|---|---|---|---|
| ███ ███ | Technician 2 - Field Services | Employee | None | Implicated Person | None | |
| Audrea Barnes | Team Leader - Call Center | Employee | None | Reporter | None | |

## Attachments

**Files**

| File | Category | Date | Description |
|---|---|---|---|
| Audrea Initial Offer Letter.pdf | | 01/22/2024 09:06:00 PM | |
| Back Dated Wage Theft Screenshot.msg | | 01/22/2024 09:06:00 PM | |

| | | | |
|---|---|---|---|
| Case 2930 Closure Summary.docx | | 01/22/2024 09:06:00 PM | |
| EXTERNAL Additional Documentation and Information for my Ethics Case.msg | | 01/22/2024 09:06:00 PM | |
| Follow Up.msg | | 01/22/2024 09:06:00 PM | |
| FW BA limited services.msg | | 01/22/2024 09:07:00 PM | |
| FW Election Day - Tuesday November 8 2022.msg | | 01/22/2024 09:08:00 PM | |
| FW EXTERNAL A Task Awaits You Review Documents - Wage Theft Prevention Notice for Demotion Audrea Barnes (372455) - Team Leader - Call Center on 11132022.msg | | 01/22/2024 09:08:00 PM | |
| Job Reclassificaiton Letter 7-5-2022.pdf | | 01/22/2024 09:08:00 PM | |
| Job Reclassification Letter 6-29-2022.pdf | | 01/22/2024 09:08:00 PM | |
| Maximus Employment Acknowledgement LTRs 6-2-2022.pdf | | 01/22/2024 09:09:00 PM | |
| NAVEX Report Key No. 278792792601 and a Plethora Series of Events.msg | | 01/22/2024 09:09:00 PM | |
| Re Please Review Draft E-mail Audrea Barnes .msg | | 01/22/2024 09:09:00 PM | |
| Ruby Teams.docx | | 01/22/2024 09:09:00 PM | |
| Second Follow Up.msg | | 01/22/2024 09:09:00 PM | |

| | | | |
|---|---|---|---|
| Verbal Warning Notice ███ ███ 09.27.2022.docx | | 01/22/2024 09:10:00 PM | |
| Voting Policy.pdf | | 01/22/2024 09:10:00 PM | |
| Wage Theft Notices 2022-11-17.pdf | | 01/22/2024 09:10:00 PM | |
| TL Comp.xlsx | | 01/22/2024 09:10:00 PM | |

## Synopsis

### Primary Issue: Employee Relations

Subcategories: Other

**Outcome:**
Unsubstantiated
**Action taken:**
Informational Communication/Coaching

**Additional details**

**Nature of Incidents/Issues:**
Team Leader Audrea Barnes alleges that IT Technician ███ ███ changed her global password without her knowledge. Audrea further alleges that her manager ignored reports that ███ made unprofessional comments about her. Finally, Audrea alleges that her manager questioned her when she requested time off for voting during her work schedule.

**Interviews Conducted:**
Audrea Barnes, Team Lead/Reporter, 12/12/2022
Ruby Williams, HR Director, 12/16/2022
Marine Salmanyan, HR Manager, 12/16/2022
Mai Vang, Director, 1/3/2023
Logust Perez, Manager, 1/4/2023
Dion Allen, Supervisor, 1/10/2023
Prudence Duke, IT Manager, 1/11/2023

**Summary of Findings:**
The investigation confirmed that Audrea Barnes was working with IT Technician ███ ███ on 9/15/2022 and 9/16/2022 on technical issues that she was experiencing. Audrea was working from home at this time and had recently been issued a new laptop. When new laptops are issued, it is standard protocol and procedure for IT to temporarily reset the global maximus password. Once the temporary password is used to unlock the computer, employees are to immediately create a new password. Audrea believes that because she could not immediately access her Deltek timecard on 9/15/2023, that ███ changed her password. However, her global password was changed only for the purpose of provisioning her new laptop.

The investigation confirmed that in frustration during a "hot mic" moment, ███ made disparaging and unprofessional remarks about Audrea. Audrea heard these remarks when ███ thought he had disconnected from a troubleshooting phone call, but he had not. As soon as Audrea reported this to her manger Mai Vang, Mai immediately contacted ███ manager, Prudence Duke, who addressed ███ and issued a verbal warning on 9/27/2022.

Audrea claims that Mai questioned her when she requested time off to vote. According to Maximus policy, employees are encouraged to find time to vote either before or after their regular work schedule. Employees who are unable to vote during non-working hours may be granted unpaid but approved time with prior approval from their supervisor. HR Director Ruby Williams issued an admin alert to CDPH leadership on Friday 11/4/2022 which outlined the policy for the upcoming election day on Tuesday 11/8/2022. Mai stated that she told Audrea that she, Mai, votes by mail and mentioned it as an option to Audrea. When Audrea expressed her preference of voting in person, she was allowed to take PTO on 11/8/2022 for voting.

The investigator looked into other allegations that Audrea brought up during the course of the investigation that were not part of her initial report. This included concerns regarding her recent rollback from a limited service exempt business analyst role to a regular non-exempt team lead role which resulted in a pay cut. The investigation found no concerns with the handling of Audrea's job change and reclassification.

**Synopsis notes:**
• The allegation that IT changed the reporters global password without their permission is unsubstantiated. The investigation found that the reporters password was temporarily reset by IT as per normal protocol when provisioning a new laptop.
• The allegation that the accused manager ignored reports of unprofessional comments made by IT is unsubstantiated. The IT Technician who made the comments was given a verbal corrective action.
• The allegation that the reporters manager questioned her when she requested time off for voting is unsubstantiated. The reporter was allowed to take PTO on election day in order to vote per Maximus policy

**Potential next steps:**
NA

**Metrics Dashboard:**
• The allegation that IT changed the reporters global password without their permission is unsubstantiated. The investigation found that the reporters password was temporarily reset by IT as per normal protocol when provisioning a new laptop.
• The allegation that the accused manager ignored reports of unprofessional comments made by IT is unsubstantiated. The IT Technician who made the comments was given a verbal corrective action.
• The allegation that the reporters manager questioned her when she requested time off for voting is unsubstantiated. The reporter was allowed to take PTO on election day in order to vote per Maximus policy

## Tasks

None

## Case Notes

None

## Related Cases

**Cases marked as related to this case**
None

# TAB 8

# EXHIBIT C

 Gmail

**Audrea CMP <audreacmp@gmail.com>**

# MALT Member Review- Approved (LRA #93023)
1 message

**Maximus | Do not reply** <maximus@maximus.com>                Thu, May 11, 2023 at 6:15 AM
To: AudreaBarnes@maximus.com, audreacmp@gmail.com
Cc: DionLAllen@maximus.com, ilaisaaneteu@maximus.com, rubywilliams@maximus.com, AnasAlNuaimie@maximus.com, AriannaAnaya@maximus.com, MicheleSCharles@maximus.com, AnnedreahJoyceSantiago@maximus.com



**Requester Details:**

Audrea Barnes                                                                           Audrea Barnes
AudreaBarnes@maximus.com                                           Original Hire Date: 05/02/2022
05/11/2023

Dear Audrea Barnes,

You are receiving this message as a follow up to your **MLOA** request.

Please be informed that your request has been approved as follows:

| Category | Value |
|---|---|
| Request | LRA #93023 |
| Request Type | Leave Request |
| Leave Sub Category | Employee's own serious health condition |
| Request Category | Continuous |
| Request start date | 05/05/2023 |
| Request end date | 06/23/2023 |
| Approval reason | Approved for FMLA in combination with state leave under CFRA. The request will be manually updated from MLOA to reflect FMLA approval. Timekeeping: All related hours should be recorded under both continuous FML and State Leave of Absence in Deltek. To determine eligibility for paid leave the employee should contact the California EDD. |

Your Request: LRA #93023

Status: Pending Manager Approval

For timekeeping purposes, please use the following code(s) for your specific approval:

| Leave/Accommodation Type | Timesheet Coding |
|---|---|
| Family Medical Leave – Continuous | LCF |
| Family Medical Leave – Intermittent | LIF |
| State Leave | LSA |
| Medical Leave of Absence | LMA |
| Personal Leave of Absence | LPA |
| Accommodations – Intermittent | LAA |
| Military Extended | MEX |
| Military Short Term | MST |

In addition, make sure to code corresponding Paid Time Off or Leave Without Pay code.

We encourage you to familiarize yourself with the details of our Maximus Employee Accommodations and Leave policies in order to fully understand your obligations under the policies.

Please note that under the Maximus Accommodations and Leave policies, you are responsible for ensuring submittal of all required documentation in a timely manner or your request will be subject to closure. Be reminded, that submitting false supporting paperwork may be grounds for disciplinary action, up to and including termination of employment.

Have questions? Please contact our Maximus Accommodations and Leave Team:
Toll Free: 833-255-MALT (6258)
Fax: 833-222-MALT (6258)
Visit us on the web at leaverequests.maximus.com or accommodations.maximus.com

# TAB 9

# EXHIBIT D

| Organization | Manager | Phone Number |
|---|---|---|
| HLTH WEST/CA HF_CALL CENTER (Eric Dedonder (67379)) | Eric Dedonder (67379) | +1 (916) 6734000 (Landline) |
| HLTH WEST/CA HF_CALL CENTER (Logust Perez (116647)) | Logust Perez (116647) | +1 (916) 6734000 (Landline) |
| HLTH WEST/CA HF_CALL CENTER (Dion Allen (352792)) | Dion Allen (352792) | |

## Organizations

Member of These Organizations

| Organization | Organization Type | Organization Subtype |
|---|---|---|
| 107335 CA OTLICP | Bonus-Merit Group/Project ID | Project - Quarterly (Apr) |
| Maximus Services LLC | Company | Company |
| 01.030.230.003 HLTH WEST/CA HF | Cost Center | Health Services West |
| Health West Division | Cost Center Hierarchy | Division |
| LH-US - CA - Remote | Location Hierarchy | Location |
| Weekly Pay Group | Pay Group | Pay Group |
| HLTH WEST/CA HF_CALL CENTER (Dion Allen (352792)) | Supervisory | Supervisory Org |

## Worker History

Worker History

| Business Process | Effective Date | Initiated On | Due Date | Completed On | Status |
|---|---|---|---|---|---|
| Bonus: Audrea Barnes (Terminated) (372455) | 08/20/2023 | 08/18/2023 09:52:53 AM | | 08/18/2023 09:52:53 AM | Successfully Completed |
| Close Position: Analyst - Bus Analysis | 08/05/2023 | 08/15/2023 12:33:00 PM | | 08/15/2023 12:33:00 PM | Successfully Completed |
| Terminate: Audrea Barnes (Terminated) (372455) | 08/04/2023 | 08/15/2023 11:40:38 AM | | 08/15/2023 12:33:00 PM | Successfully Completed |
| Leave Request: Audrea Barnes (Terminated) (372455) | 08/03/2023 | 08/07/2023 10:04:09 AM | | 08/07/2023 10:04:09 AM | Successfully Completed |
| Leave Request: Audrea Barnes (Terminated) (372455) | 07/25/2023 | 07/01/2023 02:00:14 PM | | 07/01/2023 02:00:14 PM | Successfully Completed |
| Leave Return for Audrea Barnes (Terminated) (372455) last day of leave on 07/24/2023, first day back at work on 07/25/2023 | 07/24/2023 | 07/27/2023 12:58:04 PM | | 07/27/2023 12:58:04 PM | Successfully Completed |
| Leave Return for Audrea Barnes (Terminated) (372455) last day of leave on 07/24/2023, first day back at work on 07/25/2023 | 07/24/2023 | 07/27/2023 12:55:53 PM | | 07/27/2023 12:55:53 PM | Successfully Completed |
| FY2023 Q3 (Apr-Jun) Bonus (Production Staff): Audrea Barnes (Terminated) (372455) | 06/30/2023 | 07/06/2023 01:53:21 PM | 07/20/2023 | 07/20/2023 04:18:02 PM | Successfully Completed |
| Leave Request: Audrea Barnes (Terminated) (372455) | 06/24/2023 | 06/28/2023 11:35:21 AM | | 06/28/2023 11:35:21 AM | Successfully Completed |
| Leave Request: Audrea Barnes (Terminated) (372455) | 06/24/2023 | 06/28/2023 11:29:28 AM | | 06/28/2023 11:29:28 AM | Successfully Completed |

# TAB 10

# EXHIBIT E

# ☰ JOHNSONHEEDER

2727 Camino del Rio South • Suite 140 • San Diego, CA 92108
(619) 233-1313 telephone • www.johnsonheeder.com

A. Melissa Johnson                                                                                            Nicole Heeder
Marilynn Mika Spencer (*of Counsel*)                                              Thomas J. McCammon (*Ret.*)

January 9, 2024

**Via U.S. Mail and Email**
Attn: John Martinez, Chief Legal Officer
Maximus, Inc.
1600 Tysons Blvd., Suite 1400
McLean, VA 22102
Johntmartinez@maximus.com

Re: Litigation Hold and Records Request for Former Maximus Employee Audrea Barnes

Dear Mr. Martinez:

Ms. Audrea Barnes has retained this firm in connection with her employment at Maximus, Inc. and Maximus Services, LLC (hereinafter "Maximus"). We have reason to believe that certain actions taken by the Maximus and its agents during my client's employment amount to violations of her rights under various provisions of California's Fair Employment and Housing Act, and Labor Code, as well as other civil laws. For these reasons, we are specifically requesting that Maximus take all steps to preserve data and information described in this letter.

We are requesting that Maximus preserve all documents, tangible things and electronically stored information potentially relevant to my client. As used in this document, "Maximus" refers to Maximus and its predecessors, successors, parents, subsidiaries, divisions and affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners and other persons occupying similar positions or performing similar functions.

Much of the information subject to disclosure, or responsive to discovery in any resulting litigation, is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

John Martinez, CLO - Maximus, Inc.
January 9, 2024
Page 2

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, optically or otherwise stored as:

- digital communications (e.g., e-mail, voice mail, instant messaging);
- e-mail server stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB);
- word processed documents (e.g., Word or WordPerfect files and drafts);
- spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- accounting application data (e.g. MAS90, Ultimate, QuickBooks);
- image and facsimile files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- sound recordings (e.g., .WAV and .MP3 files);
- video and animation (e.g., .AVI and .MOV files);
- databases (e.g., Access, Oracle, SQL Server data, SAP);
- contact and relationship management data (e.g., Outlook, ACT!);
- calendar and diary application data (e.g., Valiant, Outlook PST, blog entries);
- online access data (e.g., E-Verify, Temporary Internet Files, History, Cookies);
- presentation (e.g., PowerPoint, Corel Presentations);
- network access and server activity logs;
- project management application data;
- computer aided design/drawing files; and/or
- backup and archival files (e.g., Veritas, Zip, .GHO)

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to Maximus, but also in areas Maximus may deem not reasonably accessible. You are obligated to preserve potentially relevant evidence from both sources of ESI, even if you do not anticipate producing such ESI.

The demand that Maximus preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to the rules of civil procedure, you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may order production of the ESI, even if it is not reasonably accessible. Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the court's authority.

Preservation of evidence requires Maximus' immediate intervention. As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. Therefore, Maximus must preserve electronically stored versions. Maximus is directed to identify and modify or suspend features of its information systems and devices that, in routing operation, operate to cause the loss of potentially relevant ESI. Maximus should anticipate that its officers,

John Martinez, CLO - Maximus, Inc.
January 9, 2024
Page 3

employees, or others may seek to hide, destroy, or alter ESI.  Maximus must act to prevent and guard against such actions.  Maximus' preservation obligation extends beyond ESI in its care, possession or custody and includes ESI in the custody of others that is subject to its direction or control. Accordingly, Maximus must notify any current or former agent, attorney, employee, custodian and contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of its obligation to do so, and must take reasonable steps to secure their compliance.

As an appropriate and cost-effective means of preservation, Maximus should remove from service and securely sequester the systems, media and devices housing potentially relevant ESI of All Custodians.

In the event Maximus deems it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices of those named above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that Maximus employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

"Forensically sound ESI preservation" means duplication of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. The products of forensically sound duplication are called, inter alia, "bitstream images" or "clones" of the evidence media. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including deleted evidence within "unallocated clusters" and "slack space."  Be advised that a conventional copy, backup or "ghosting" of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data existing in, e.g. unallocated clusters and slack space.

Please confirm within 30 calendar days of receipt of this letter that Maximus has taken steps to preserve ESI and tangible documents potentially relevant to any subsequent action. If Maximus has not undertaken the steps outlined above, or has taken other actions, please describe what Maximus has done to preserve potentially relevant evidence.

John Martinez, CLO - Maximus, Inc.
January 9, 2024
Page 4

Additionally, **I am making a request for copies of my client's employment and wage records pursuant to Labor Code Sections 1198.5, 1174, 432, and 226**. These records should be sent to my office, at the above address, within the time required by law, but not to exceed 30 calendar days from the date you received this request for the personnel file or 21 calendar days for the wage records. Failure to comply with this request is an infraction and may subject the Employer to various penalties. If Maximus does not provide the above documents as requested, we will consider its inaction further evidence of retaliation.

We appreciate your cooperation in this matter.

Sincerely,

JOHNSON HEEDER LLP

Nicole Heeder,
Attorneys for Audrea Barnes

Direct: 619-233-1313 x 109
nicole@johnsonheeder.com

NLH:hb
cc: RubyWilliams@maximus.com

# TAB 11

SEYFARTH SHAW LLP
Ryan McCoy (SBN 276026)
rmccoy@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:   (415) 397-8549

SEYFARTH SHAW LLP
Reiko Furuta (SBN 169206)
rfuruta@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:   (310) 201-5219

Attorneys for Defendant
MAXIMUS CONSULTING SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUDREA BARNES,<br><br>                    Plaintiff,<br><br>          v.<br><br>MAXIMUS CONSULTING SERVICES, INC.; and DOES 1 through 30; inclusive,<br><br>                    Defendants. | Case No. 5:25-cv-02108-KK-SP<br><br>**DECLARATION OF REBECCA KENAWELL IN SUPPORT OF DEFENDANT MAXIMUS CONSULTING SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**<br><br>(Riverside County Superior Court Case No. CVPS2504251)<br><br>Date:   July 2, 2026<br>Time:   9:30 a.m.<br>Ctrm.:  3<br><br>Complaint Filed:  July 2, 2025<br>FAC Filed:  December 3, 2025<br><br>Trial Date:  None Set |

DECLARATION OF KENAWELL ISO MOTION FOR SUMMARY JUDGMENT

I, Rebecca Kenawell, declare:

1.    I am a Senior Vice President in Human Resources for Maximus, Inc. ("Maximus"), the ultimate parent company of Maximus Consulting Services, Inc. ("Defendant"). I have been employed as Senior Vice President with Maximus since January 2021.  I am over the age of 18 and I make this declaration based on my personal knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.  If called to do so, I could and would testify competently thereto.

2.    In my role as Senior Vice President, I report directly to the Chief Human Resources Officer, and my responsibilities include leading and overseeing the HR Compliance function. HR Compliance's role in a reduction in force is to ensure a consistent, data-driven, and compliant approach to evaluating employees for purposes of selection. As part of that process, the HR Compliance team develops and applies the employee ratings used in a RIF by first identifying the relevant employee population, defining the rating criteria in advance, and then systematically reviewing available internal records and data for each employee, including performance history and other job-related information. The team applies those criteria consistently across the group, calibrates results to ensure comparability, and generates the comparative ratings that inform selection decisions. I have access to the internal records and data used to prepare the ratings.

3.    Consistent with Maximus's policies and practices, HR Compliance uses a specific formula to rate employees, which consists of creating a retention credit score by combining the overall rating in the employee's most recent annual performance review with service credits based on the employee's most recent hire date with Maximus.

4.    In 2023, HR Compliance prepared ratings of employees at the Call Center for the California Health West Division for an anticipated reduction in force. Based on my review of HR Compliance's internal records, Plaintiff Audrea Barnes's ("Plaintiff") rating on her annual performance review prepared on February 27, 2023 was used to

2

DECLARATION OF SLATTERY ISO MOTION FOR SUMMARY JUDGMENT

create her retention credit score. A copy of Plaintiff's performance review is attached as **Exhibit 1**.

5.    Based on the score from Plaintiff's performance review and her short employment tenure, Plaintiff's retention credit score was the fifth lowest out of 133 employees ranked. Plaintiff was one of 53 Call Center employees at the California Health West Division, including six individuals in her same job position, whose employment was terminated due to the reduction in force in August 2023. A copy of the spreadsheet containing the retention credit scores and the termination decisions for the employees from the Call Center is attached as **Exhibit 2**.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.  Executed this 3rd day of June 2026 in Tysons Corner, Virginia.

Rebecca Kenawell

3

DECLARATION OF SLATTERY ISO MOTION FOR SUMMARY JUDGMENT

# TAB 12

# EXHIBIT 1

# Barnes, Audrea D

Team Leader - Call Center

Manager: Dion Allen (352792)
Evaluated By: Dion Allen (352792)

## 2023 April FP Merit (Production Staff)

Organization: HLTH WEST/CA HF_CALL CENTER (Dion Allen (352792))
Location: US - CA - Remote
03/01/2022 - 02/28/2023

## Overall

### Manager Overall Evaluation

**Calculated Rating:** 3.47

**Rating:** Meets Expectations

**Comment:** Audrea is meeting current expectations while ramping to full capacity. She is working diligently to obtain all necessary information and resources to perform at an elevated level. Audrea is partnering with peers and supervisor to achieve success. I am looking forward to continuing partnering with Audrea this year, to ensure continued success and growth in every area.

## Acknowledgement

### Employee

**Entered by:** Audrea Barnes (Terminated) (372455)   **Date:** 02/27/2023

**Status:** Acknowledge Review

**Comment:**

## Goals

### Attendance 1:

#### Manager Evaluation

**Rating:** Above Expectations

**Response:** Audrea has missed two days. Her dependability and availability for her peers and customers are excellent.

### Attendance 2:

#### Manager Evaluation

**Rating:** Superior

**Response:** Audrea has been stellar in this area as well. She has maintained reliable performance relative to tardies from break, lunch, and to work.

### Quality Score:

#### Manager Evaluation

**Rating:** Meets Expectations

**Response:** Audrea has provided excellent call quality performance with 98.44% accuracy and 99.29% overall quality with limited calls. She has met the standard for getting up to speed with the team lead role over the last three months.

## Perf Metric 1:

### Manager Evaluation

Rating:          **Meets Expectations**

Response:    Audrea is meeting in this area of performance due to her limited time in full team lead capacity. She is a quick study and receptive to coaching. I look forward to seeing her expand in the role.

## Perf Metric 2:

### Manager Evaluation

Rating:          **Meets Expectations**

Response:    Audrea has shown the ability to exceed expectations in the team lead role. She has been willing to work on multiple scripts and queues, as required. Audrea will need to continue to grow in the role to ensure she is the subject matter expert the agents can depend on.

--- Section Summary ---

## Manager Evaluation

Calculated Rating:    3.6
Rating:          **Above Expectations**

# Competencies

## Communication Skills

Demonstrates effective written, verbal and listening skills, and the ability to understand and learn from others. Strong inter-personal skills; develops rapport and maintains trust. Effectively conveys ideas and facts, both orally and in writing, so that the message can be understood by the intended audience.

### Manager Evaluation

Rating:          **Above Expectations**

## Client Centric

Demonstrates a commitment to serving internal and external clients. Responds promptly to requests and effectively resolves issues. Exhibits a positive attitude and the willingness to make a special effort to help others.

### Manager Evaluation

Rating:          **Meets Expectations**

## Core Values

Demonstrates the MAXIMUS principles of integrity, respect for others, honesty, diversity and a passion for serving our clients and customers. Takes the correct action, even under difficult circumstances. Earns and reciprocates trust and respect through consistent honesty and confidentiality in appropriate situations.  Adheres to high standards of transparency and fairness while interacting with others. Does not use position or authority for personal gain.  Promotes a collaborative and inclusive work environment where employees share knowledge freely.

### Manager Evaluation

Rating:          **Above Expectations**

## Functional (Job) Knowledge

Demonstrates job-specific skills and aptitude for assigned duties. Uses tools and resources effectively. Works to continuously improve and enhance job knowledge and abilities.

Manager Evaluation

Rating:                    **Meets Expectations**

## Analytical and Logical

Demonstrates resourcefulness and innovation in finding ways to resolve issues and meet requirements. Makes timely, informed decisions that take into account the facts, goals, constraints and risks. Examines data to effectively comprehend issues, draw conclusions, and see underlying trends and correlations. Summarizes problems to identify challenges, benefits, risks and costs. Seeks advice from others when necessary.

Manager Evaluation

Rating:                    **Meets Expectations**

## Digital Skills

Demonstrates a willingness to learn about and adapt to new technologies that assist in job effectiveness and efficiencies, improve work processes, and customer experiences. New technologies may include, but are not limited to, cognitive computing, intelligent interactive voice recognition, process automation, advanced analytics, machine learning, and related tools and methods.

Manager Evaluation

Rating:                    **Meets Expectations**

## Commitment to Quality

Ensures work performed is correct, complete and conforms to requirements.  Consistently ensures quality from the beginning, recognizing that future corrections often require extra time and resources. Demonstrates a commitment toward teamwork and the achievement of shared goals.

Manager Evaluation

Rating:                    **Meets Expectations**

## Results-Focused

Takes ownership for assignments and holds accountability for results. Demonstrates knowledge of key numbers (performance and/or financial) and seeks opportunities to achieve business targets. Shows persistence and resilience in overcoming obstacles and handling setbacks. Demonstrates the ability to successfully work independently, as well as collaborate with others to find solutions to problems. Readily accepts suggestions for improvement and adapts well to change.

Manager Evaluation

Rating:                    **Meets Expectations**

## Adheres to MAXIMUS Policies

Complies with all corporate policies, including the Standards for Business Conduct and Ethics, Authority Matrix, Employee Manual and other policy documents.  Meets compliance (e.g., annual training), performance management processes and other reporting requirements in a timely manner. Strictly adheres to security and privacy guidelines and requirements, including the safeguarding of personally identifiable information (PII) and personal health information (PHI), and the safeguarding of MAXIMUS and client systems. Is familiar with the MAXIMUS Information Security Policy and standards related to the execution of job-specific responsibilities. Maintains confidentiality in professional interactions and immediately alerts manager of privacy and security issues.

Manager Evaluation

Rating:                    **Above Expectations**

## Leadership/Performance Management

Serves as a role model for exhibiting our core values and achieving business objectives.  Demonstrates self-management and guidance of others in the areas of motivation, goal setting and attainment, and change adaptation.

Manager Evaluation

Rating:                    Meets Expectations

---

##### Section Summary

## Manager Evaluation

Calculated Rating:    3.3
Rating:                    Meets Expectations

Comment:       Audrea continues to grow into the role. She has made great stride to perform each task at hand. She has been flexible and demonstrated a willingness to exceed.

# TAB 13

# EXHIBIT 2

| Employee ID | HR Compliance Recommendation | Rif Toolkit Retention Credit | Name | Job Profile ID | Job Profile Combined | Cost Center |
|---|---|---|---|---|---|---|
| 284427 | Maintain | 110.45 |  | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 352309 | Maintain | 110.45 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 352792 | Maintain | 110.45 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 225894 | Maintain | 104.67 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 227719 | Maintain | 104.67 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 226872 | Maintain | 104.67 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 297117 | Maintain | 103.29 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 284314 | Maintain | 102.45 | | CAL211 | Supervisor - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| **352783** | **Release** | **102.45** | | **CAL211** | **Supervisor - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **284627** | **Release** | **102.43** | | **CAL211** | **Supervisor - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **225856** | **Release** | **96.67** | | **CAL211** | **Supervisor - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **297121** | **Release** | **95.29** | | **CAL211** | **Supervisor - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **349651** | **Release** | **94.47** | | **CAL211** | **Supervisor - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| 367639 | Maintain CSR | 110.32 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415553 | Maintain CSR | 109.85 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 349945 | Maintain CSR | 109.59 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 346335 | Maintain CSR | 102.49 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 350942 | Maintain CSR | 102.46 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 352029 | Maintain CSR | 102.45 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 363424 | Maintain CSR | 102.37 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 367510 | Maintain CSR | 102.32 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415804 | Maintain CSR | 101.85 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415801 | Maintain CSR | 101.85 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415964 | Maintain CSR | 101.85 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 419767 | Maintain CSR | 101.8 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 441825 | Maintain CSR | 101.59 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 348628 | Maintain CSR | 94.48 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 348753 | Maintain CSR | 94.48 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 351615 | Maintain CSR | 94.46 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 353416 | Maintain CSR | 94.45 | | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |

| | | | | | |
|---|---|---|---|---|---|
| 351196 | Maintain CSR | 94.45 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 356695 | Maintain CSR | 94.41 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 364276 | Maintain CSR | 94.37 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 367686 | Maintain CSR | 94.32 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 367517 | Maintain CSR | 94.32 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415800 | Maintain CSR | 93.85 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415440 | Maintain CSR | 93.85 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415507 | Maintain CSR | 93.85 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415748 | Maintain CSR | 93.85 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 345353 | Maintain CSR | 93.69 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 434586 | Maintain CSR | 93.69 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 377240 | Maintain CSR | 93.69 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 441843 | Maintain CSR | 93.59 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 356969 | Maintain CSR | 92.96 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| **351372** | **Release** | **86.46** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| 353118 | Maintain CSR | 86.45 | CSR006E | English CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| **353393** | **Release** | **86.45** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **352916** | **Release** | **86.45** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **352924** | **Release** | **86.45** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **353288** | **Release** | **86.45** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **354926** | **Release** | **86.43** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **356538** | **Release** | **86.41** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **363328** | **Release** | **86.37** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **363410** | **Release** | **86.37** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **367690** | **Release** | **86.32** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **372432** | **Release** | **86.26** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **372938** | **Release** | **86.26** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **415951** | **Release** | **85.85** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **415961** | **Release** | **85.85** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **422247** | **Release** | **85.78** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **422155** | **Release** | **85.78** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **422269** | **Release** | **85.78** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **422335** | **Release** | **85.78** | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |

| ID | Status | Value | | Code | Role | Location |
|---|---|---|---|---|---|---|
| **429557** | **Release** | **85.72** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **434512** | **Release** | **85.69** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **434568** | **Release** | **85.69** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **434548** | **Release** | **85.69** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **441709** | **Release** | **85.59** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **441799** | **Release** | **85.59** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **337397** | **Release** | **78.69** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **346248** | **Release** | **78.49** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **434545** | **Release** | **69.69** | | **CSR006E** | **English CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| 351679 | Move to CSR level | 110.45 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 296820 | Maintain TL status | 103.31 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 297113 | Move to CSR level | 103.29 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 304851 | Maintain TL status | 103.14 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 337378 | Move to CSR level | 102.69 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 337936 | Move to CSR level | 102.66 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 351912 | Move to CSR level | 102.46 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 357206 | Maintain TL status | 102.41 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 360139 | Move to CSR level | 102.41 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 356301 | Move to CSR level | 102.41 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 364269 | Move to CSR level | 102.37 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 296739 | Move to CSR level | 95.31 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 337509 | Maintain TL status | 94.68 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 351905 | Move to CSR level | 94.46 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 353230 | Maintain TL status | 94.45 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 355291 | Maintain TL status | 94.43 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 355477 | Move to CSR level | 94.43 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 360113 | Maintain TL status | 94.41 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 202217 | Maintain TL status | 88.91 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| 337389 | Maintain TL status | 86.69 | | CAL208E | English Team Leader - Call Cente | HLTH WEST/CA HF (01.030.230.003) |
| **337479** | **Release** | **86.69** | | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |
| **351482** | **Release** | **86.45** | | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |
| **355888** | **Release** | **86.43** | | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |
| **355317** | **Release** | **86.43** | | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |

| ID | Action | Value | Name | Code | Title | Location |
|---|---|---|---|---|---|---|
| **355397** | **Release** | **78.43** |  | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |
| **372455** | **Release** | **78.26** | **Audrea Barnes** | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |
| **337382** | **Release** | **70.69** |  | **CAL208E** | **English Team Leader - Call Ce** | **HLTH WEST/CA HF (01.030.230.003)** |
| 364212 | Maintain CSR | 102.37 |  | CSR006H | Hmong CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 345435 | Maintain CSR | 109.99 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 355275 | Maintain CSR | 102.43 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 422130 | Move to CSR level | 101.78 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 430738 | Move to CSR level | 101.59 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| **337400** | **Release** | **94.69** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| 356947 | Maintain CSR | 94.41 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| **363320** | **Release** | **94.37** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| 415998 | Maintain CSR | 93.85 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415956 | Maintain CSR | 93.85 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 415721 | Move to CSR level | 93.85 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 422249 | Maintain CSR | 93.78 |  | CSR006S | Spanish CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| **297083** | **Release** | **87.29** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **337521** | **Release** | **86.69** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **351454** | **Release** | **86.45** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **355530** | **Release** | **86.43** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **357130** | **Release** | **86.41** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **415975** | **Release** | **85.85** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **429942** | **Release** | **85.72** |  | **CSR006S** | **Spanish CSR 1 - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **468273** | **Release** | **68.98** |  | **CSR009S** | **Spanish Sr CSR - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| **329220** | **Release** | **68.98** |  | **CSR009S** | **Spanish Sr CSR - Call Center** | **HLTH WEST/CA HF (01.030.230.003)** |
| 296818 | Maintain TL status | 111.31 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 338910 | Move to CSR level | 102.49 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 348929 | Maintain TL status | 102.48 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 297116 | Maintain TL status | 95.29 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 297100 | Maintain TL status | 95.29 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 351862 | Move to CSR level | 94.46 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 351870 | Maintain TL status | 94.46 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 353371 | Maintain TL status | 94.45 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |
| 297110 | Move to CSR level | 87.29 |  | CAL208S | Spanish Team Leader - Call Cent | HLTH WEST/CA HF (01.030.230.003) |

| 357225 | Release | 86.41 | | CAL208S | Spanish Team Leader - Call Ce | HLTH WEST/CA HF (01.030.230.003) |
| 415774 | Release | 93.85 | | CSR006T | Tagalog CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 434571 | Maintain CSR | 93.69 | | CSR006T | Tagalog CSR 1 - Call Center | HLTH WEST/CA HF (01.030.230.003) |
| 441782 | Release | 85.59 | | CSR006TL | Thai, Laotian CSR 1 - Call Cen | HLTH WEST/CA HF (01.030.230.003) |